GUARANTY TRUST CO. OF NEW YORK v. KOEHLER et al.

KOEHLER et al. v. GUARANTY TRUST CO. OF NEW YORK.

(Circuit Court of Appeals, Eighth Circuit.    March 30, 1912.)

Nos. 3,648, 3,667.

*(Syllabus by the Court.)*

**1.** Appeal and Error (§§ 267, 223*)—Presenting Question in Lower Court
—Sufficiency of Findings.

No objection or exception is required to present to an appellate court
the question whether or not a special finding of facts made by a court
upon the trial of an action at law warrants the judgment, because, like
the question whether or not the verdict sustains the judgment upon it,
this is an issue of law which arises upon the face of the record.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1572–
1581; Dec. Dig. §§ 267, 223.*]

**2.** Appeal and Error (§ 839*)—Review—Scope and Extent.

Legal issues other than those specifically presented for determination
may properly be considered and decided by an appellate court where
they naturally arise and are pertinent to the questions at issue and to
farther proceedings in the trial court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2915,
3279–3300; Dec. Dig. § 839.*]

**3.** Principal and Agent (§ 150*)—Liabilities to Third Persons—Unau-
thorized Acts of Agent.

A principal is not relieved of liability upon a separable part of a con-
tract which he authorized his agent to make by the fact that the latter
undertook in excess of his authority to bind him to another part of the
agreement.

Principals authorized their agents to guarantee the payment of $22,-
500 and interest thereon.

*Held,* they were not released from that guaranty by the fact that their
agents also guaranteed by the same contract the payment by them of
interest on $40,000 more.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 556–
563; Dec. Dig. § 150.*]

**4.** Guaranty (§ 18*)—Principal and Agent (§ 110*)—Requisites of Con-
tract—Parties—Authority of Agent.

The failure of some of the obligors named in the body of a contract
of guaranty to execute it constitutes no defense to the liability of other
obligors named therein, who, with knowledge that the former are not
bound, execute and deliver the contract to the obligee, and thereby in-
duce him to part with the consideration thereof.

Agents authorized to make a guaranty for their principals executed it
for them and for another party named in the guaranty as an obligor
without any authority from the latter at the same time that they made
it for their principals, and they then delivered it to the obligee.

*Held,* the principals who authorized the agents to make the guaranty
were bound by it.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 21; Dec. Dig.
§ 18;* Principal and Agent, Cent. Dig. §§ 323–325; Dec. Dig. § 110.*]

**5.** Guaranty (§ 1*)—Requisites of Contract—Agreement to Guarantee.

Where one agrees to guarantee the payment of money at stated times,
and fails both to guarantee and to pay, an action lies on the contract to
recover the amount past due and unpaid, although no farther guaranty
was made.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 1; Dec. Dig.
§ 1.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. GUARANTY (§ 5\*)—REQUISITES OF CONTRACT—DEBT SECURED.**

A prospective principal debt and prospective principal debtors that may be identified by the contract and subsequent events .are as effectual to sustain a guaranty as an existing debt and debtor.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 7; Dec. Dig. § 5.\*]

**7. CONTRACTS (§ 170\*)—CONSTRUCTION—PRACTICAL INTERPRETATION OF PARTIES.**

The practical interpretation of a contract by the parties to it while they are engaged in its performance, and before any controversy concerning it has arisen, is one of the most satisfactory tests of its meaning, and courts may generally adopt that construction with safety.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. § 170.\*

Practical construction of contracts by parties, see note to Davis v. Alpha Portland Cement Co., 73 C. C. A. 392.]

**8. FRAUDS, STATUTE OF (§ 33\*)—PROMISE TO ANSWER FOR DEBT, DEFAULT, OR MISCARRIAGE OF ANOTHER—ORIGINAL OR COLLATERAL PROMISE.**

When the main object of the guarantors is not to answer for the debt, default, or miscarriage of another, but is to obtain substantial benefits or advantages for themselves which actually inure to them, their guaranty is also their own original agreement, and no writing is essential to its validity under the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 50–53, 56; Dec. Dig. § 33.\*]

**9. PRINCIPAL AND AGENT (§ 166\*)—AUTHORITY OF AGENT—RATIFICATION OF UNAUTHORIZED ACTS.**

Full knowledge by the principal of all the material facts is indispensable to a ratification by him of the unauthorized acts of his agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 627–633; Dec. Dig. § 166.\*]

**10. PRINCIPAL AND AGENT (§ 179\*)—NOTICE TO AGENT—IMPUTATION TO PRINCIPAL.**

It is only when the knowledge acquired by an agent in a previous transaction is legally presumed or clearly proved by circumstances or other evidence to have been in his mind at the time of a subsequent transaction that it can be imputed to his principal therein.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 685–688; Dec. Dig. § 179.\*]

**11. DEPOSITARIES (§ 4\*)—PAYMENT—RIGHTS OF DEPOSITARY—RECOVERY.**

A depositor may not recover his general deposit of his creditor after his debt in excess of his deposit has become due unless he first pays his debt.

Debtors remitted $7,500 to their creditor to pay their debt and requested him to hold it as a special deposit for a short time until they could try to arrange a suit by the creditor against them and other co-obligors. The creditor acceded to their request, but they never arranged the suit and some months afterwards the creditor applied the deposit to the payment in part of his debtors' matured obligation.

*Held*, the debtor had no cause of action to recover back the $7,500.

[Ed. Note.—For other cases, see Depositaries, Cent. Dig. §§ 3–13; Dec. Dig. § 4.\*]

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

Action by the Guaranty Trust Company of New York against Hugo A. Koehler and others. From the judgment (187 Fed. 192), both parties bring error. Reversed and remanded, with directions.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

T. F. Chaplin and Herbert Barry (Julien T. Davies and Eliot, Chaplin, Blayney & Bedal, on the brief), for Guaranty Trust Company.

James C. Jones and Thomas B. Harlan (Reynolds & Harlan and Jones, Jones, Hocker & Davis, on the brief), for Koehler and others.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

SANBORN, Circuit Judge. These writs of error challenge a judgment on the merits in favor of the defendants below, Hugo A. Koehler, Henry Koehler, Jr., and American Brewing Company, for their costs in an action at law brought against them by Guaranty Trust Company of New York upon a contract between them and that company dated June 14, 1905. The plaintiff below complains that a judgment was not rendered against these defendants for $5,943.71, and the defendants that a judgment was not rendered against the plaintiff for $7,500 on their counterclaim. The parties by a written stipulation waived a jury, and agreed that the case should be referred to Hon. Jesse A. McDonald to hear the evidence, to make a special finding of the facts, to state his conclusions of law, and to report them to the court, that the court might approve or disapprove, or modify, the report, and might enter such a finding and judgment as it deemed proper, and that the finding of facts and conclusions of law when adopted by the court should be deemed the findings and conclusions of the court. The referee made a special finding of facts which was approved and adopted by the court. He stated conclusions of law which led him to recommend a judgment against the defendants, both on the plaintiff's cause of action and on the defendants' counterclaim. The court disapproved some of the referee's conclusions of law, and rendered a judgment for costs against the plaintiff. The result is that the special finding of facts made by the referee became the special finding of the court, and the writs of error present the question whether or not this finding warrants the judgment below, and, if not, what judgment it does warrant.

[1] The opinion of the court below contains a statement of the pleadings and a copy of the contract in suit, and it is unnecessary to set them forth here in full again. Guaranty Trust Company v. Koehler (C. C.) 187 Fed. 192, 199. Counsel for all the parties have requested this court to review and decide this case on the merits. No objection or exception is required to present to an appellate court the legal issue whether or not a special finding of facts made by the court upon the trial of an action at law warrants the judgment, because, like the question whether or not a verdict sustains the judgment upon it, this is an issue of law which arises upon the face of the record. Webb v. National Bank of Republic, 146 Fed. 717, 719, 77 C. C. A. 143, 145, and cases there cited.

[2] Legal issues other than those specifically presented for determination may properly be considered and decided by an appellate court where they naturally arise and are pertinent to the questions at issue and to further proceedings in the trial court. Collin County National Bank v. Hughes, 155 Fed. 389, 83 C. C. A. 661. An examination of the record in the light of these propositions of law has con-

vinced us that the issue whether or not the finding of facts sustains the judgment in this case is properly presented for our determination, and that its decision involves the determination of every material question presented for hearing in this case and without more we proceed with its consideration.

The contract in suit was made on June 14, 1905, in Manila. The parties to it were the plaintiff on one side and on the other side the defendants, American Brewing Company, a corporation, Hugo A. Koehler, and Henry Koehler, Jr., all of St. Louis, Mo., hereafter called the local defendants, and William Wolff, under the name of William Wolff & Co., F. H. Hilbert, C. H. Hilbert, and Pacific Oriental Trading Company, a corporation, all of San Francisco, Cal. While all these defendants were parties to this action, none but the local defendants were served with process or appeared in the case. The agreement recited that the plaintiff had advanced $48,500, more or less, in connection with the property of the Philippine Lumber & Development Company, and it agreed to advance $14,000 more to enable the defendants to bid at a proposed sale of that property under an order of the Court of First Instance of Manila, and that, in consideration of those advances, the defendants agreed that a mortgage should be given by those who acquired the property at the proposed purchase on all the assets they should get by virtue of the sale to secure the plaintiff for its advances made and to be made; that these advances should draw interest payable monthly at 7 per cent. per annum, and should be secured to the amount of $40,000 by a first mortgage on the property to be acquired and to the amount of $22,-500 principal, and the interest on the entire $62,500, by the joint and several guaranty of the defendants that the advances should be paid back at the rate of $3,750 on account of the $40,000 and $3,750 on account of the $22,500 annually, that the mortgage should be prepared by the solicitors of the plaintiff, and should be given when the necessary power of attorney arrived in Manila, and that the defendants should cause the plant, buildings, timber, and other property to be acquired to be kept insured by the owners for the security of the plaintiff. The defendants made this contract, not for the pecuniary benefit of the prospective purchasers or others, but for their own benefit. The property of the Lumber Company was for sale for $62,500, and they believed that it was worth, and they were subsequently offered, $90,000 for it. The Lumber Company owed the Trading Company between $35,000 and $42,000. It owed Henry M. Jones $42,000 and he had indorsed its notes held by the Trading Company to the amount of $27,767. The Trading Company had made a general assignment for the benefit of its creditors to Paul Reiss, who was the agent and attorney of the local defendants in Manila, Clarence L. Mitchell, who was the agent in Manila of all the other defendants except the Trading Company, and H. B. C. Jones, who was an inactive assignee. The Trading Company owed the American Brewing Company $175,000. Henry Koehler, Jr., was the president and Hugo A. Koehler was the vice president, and each of them owned about one-third of the capital stock of the Brewing Company. The Trading Company owed William Wolff $170,000. He was one of its stockholders and an indorser.

of some of its notes. F. H. Hilbert and C. H. Hilbert were stockholders and managing officers of the Trading Company, and guarantors of parts of its debt to the Brewing Company and to Wolff. If, therefore, the defendants' agents, Reiss and Mitchell, could purchase the Lumber Company property for $62,500, and sell it for $90,000, $27,500 less expenses might and probably would flow through Reiss and Mitchell as trustees to the creditors of the Trading Company, the larger of which were the Brewing Company and Wolff, and the difference between the amount of the mortgage to the plaintiff on the Lumber Company property, which was about $45,000, and the $62,500 that the receiver of the Lumber Company, would realize from the sale, would flow to the creditors of the Lumber Company, one of the largest of whom was the Trading Company, and hence in large part to its creditors, the Brewing Company and Wolff, and the Hilberts and Wolff might also be released in part from their indorsements. It was for the purpose of effecting these results that the defendants made their contract to guarantee.

Within 20 days after the contract was made, the plaintiff advanced the amount it agreed to put up, and with this money Reiss and Mitchell bought and took possession of the plant and property of the Lumber Company. They subsequently realized from that transaction $10,000 which they used to operate the mill. They and their successory trustee operated the plant, made a mortgage on it to the plaintiff to secure the $40,000, and paid the monthly interest as it came due under the contract of June 14, 1905, for 13 months.

Between June 14, 1905, and July, 1907, the local defendants requested and secured, by means of promises to pay at later dates, several extensions of the time for the payment of the amounts which fell due in June, 1906. On January 12, 1907, they sent to the plaintiff $7,500 in answer to its demand for a payment of the amounts due under the guaranty, and wrote it a letter that the reason they had not sent this money before was that the Hilberts and Wolff would not pay their share on account of their losses in the San Francisco fire, and they asked the plaintiff to sue themselves, the Hilberts and Wolff jointly, to accept the $7,500 as a deposit as evidence of their good faith, and to so hold it until the writer could see the plaintiff in New York on the following Friday. They also wrote in that letter that their remittance did not include interest, that they were expecting a cable from Manila stating the exact sum due on that account, and that, when they ascertained the amount, they would cover it by draft immediately. In June, 1907, the plaintiff demanded payment of the additional installment and the interest which had become due, and in July, 1907. the local defendants denied all liability under their contract, and for the first time demanded the repayment of the $7,500, on the ground that the agreement of June 14, 1905, was not a contract of guaranty, and imposed no liability upon them.

The reasons now urged in support of the contention that the defendants are not liable under the contract are that the agreement was incomplete and the local defendants were never bound by it because Reiss had no authority to execute it on behalf of the Trading Com-

pany, that the agreement was not a contract of guaranty, but a contract to guarantee, and that the agreement was void under the statute of frauds.

[3] The special finding of facts sets forth the portions of the letters and cablegrams which evidence the authority of Reiss and Mitchell. From these the legal conclusion drawn by the court below was that they had authority on behalf of all the defendants, but the Trading Company to guarantee the repayment to the plaintiff of the $22,-500 and interest on the installments thereof after these installments became due, but no authority to guarantee the payment of interest on the $22,500 before the respective maturities of the installments, and none to guarantee the payment of any interest on the $40,000. The court then rightly concluded that the fact that they guaranteed the payment of this interest in excess of their authority did not relieve their principals from their obligation to perform that part of the contract which they had empowered their agents to make on their behalf. A principal is not relieved from a separable part of a contract which he authorized his agent to make by the fact that the latter undertook in excess of his authority to bind him to another part of the agreement. Reed v. Seymour, 24 Minn. 273, 280; Jesup v. City Bank of Racine, 14 Wis. 331, 339; Yost v. Ramey, 103 Va. 117, 48 S. E. 862; Wilson v. Beardsley, 20 Neb. 449, 451, 30 N. W. 529.

[4] A review of the letters and cablegrams in the finding of facts evidencing the authority of Reiss and Mitchell has convinced, however, that they had ample authority from all the defendants, except the Trading Company, to guarantee the payment of the interest on the $22,500, not only after the installments thereof fell due, respectively, but also from the date of the contract. These letters and cablegrams show that all the parties to the transaction always contemplated a loan by the plaintiff and a payment of interest thereon from the date of the loan, and that they all understood that $22,500 was to be repaid in installments of $3,750 annually. By a cablegram from Reiss and Mitchell in the early part of May the defendants other than the Trading Company were informed that the necessary money would be supplied at 8 per cent. per annum, provided the demanded guaranty for the amount in excess of $40,000 was given. In June they were notified by cablegrams that their agents in Manila could arrange "for full amount 7 per cent.," and that there must be a guaranty of the "amount in excess of $40,000.00, 7 per cent." The amount that would be required in excess of $40,000 was then unknown, but, in answer to these cablegrams, the defendants authorized their agents to guarantee the payment of $23,000. The legal effect of this correspondence is that the principals intended to, and did, authorize Reiss and Mitchell to guarantee the payment of the amount of the principal in excess of $40,000, not exceeding $23,000 requisite to make the contemplated purchase, together with the monthly interest on this excess over $40,000 at the rate of 7 per cent. per annum from the date of the contract. Reiss and Mitchell had ample authority to guarantee on behalf of all the defendants, except the Trading Com-

pany, the payment of $22,500 and monthly interest thereon at 7 per cent. per annum until these amounts were paid, and the fact that they also undertook to bind their principals to pay the interest on the $40,000 did not release the latter from their authorized guaranty.

But the contract recited that it was made by the Trading Company as well as by the other defendants. Reiss and Mitchell executed it on behalf of all these parties. They had authority to execute it for the other defendants, but none to do so for the Trading Company, and from these facts the referee and the court deduced the legal conclusion that the contract was incomplete, and none of the defendants were bound by it. There are many authorities to the effect that where a contract recites the names of parties to be jointly, or jointly and severally, bound by it, and some of them have signed it and others have not, the contract is incomplete, and the former do not become liable under it. Wood v. Washburn, 2 Pick. (Mass.) 24; Russell v. Annable, 109 Mass. 72, 73, 12 Am. Rep. 665; Dole Bros. v. Cosmopolitan Preserving Co., 167 Mass. 481, 46 N. E. 105, 57 Am. St. Rep. 477; Fish v. Johnson, 16 La. Ann. 29; Arnold v. Scharbauer (C. C.) 116 Fed. 492; United States v. O'Neill (C. C.) 19 Fed. 567; Smith v. United States, 2 Wall. 219, 230, 17 L. Ed. 788; Sharp v. United States, 4 Watts (Pa.) 21, 23, 28 Am. Dec. 676; McDaniel v. Anderson, 19 S. C. 211; Barber v. Burrows, 51 Cal. 473, 474; Bean v. Parker, 17 Mass. 591, 604; Waggeman v. Bracken, 52 Ill. 468, 470; Andrews v. Etheridge, 9 Mass. *383; Johnston v. Kimball Township, 39 Mich. 187, 33 Am. Rep. 372; Board of Education of Rapid City v. Sweeney, 1 S. D. 642, 48 N. W. 302, 36 Am. St. Rep. 767; Gay v. Murphy, 134 Mo. 98, 34 S. W. 1091, 56 Am. St. Rep. 496; Martin v. Hornsby, 56 Minn. 187, 56 N. W. 751, 43 Am. St. Rep. 487; Bjoin v. Anglim, 97 Minn. 526, 107 N. W. 558; Weir v. Mead, 101 Cal. 125, 35 Pac. 567, 40 Am. St. Rep. 46; Goodyear Dental Vulcanite Co. v. Bacon, 151 Mass. 460, 24 N. E. 404, 8 L. R. A. 486; Wild Cat Branch v. Ball, 45 Ind. 213; Novak v. Pitlick, 120 Iowa, 286, 94 N. W. 916, 98 Am. St. Rep. 360. But the reason for these decisions is that those who sign do so in the faith and on the implied condition that the others whose names are recited in the agreement as obligors with them shall also sign and shall thereby diminish the ultimate liability of the actual signers, and that the absence of the signatures of some named in the contract is notice to the obligee that the contract is incomplete, and that no one is bound by it. In the case in hand the facts found demonstrate, however, that the defendants, other than the Trading Company, neither intended nor expected that that company should become an obligor with them, or that their liability would be diminished by its signature, for it was insolvent and they knew it. They had authorized Reiss and Mitchell to make the guaranty without the Trading Company. Reiss and Mitchell knew when they signed and delivered the agreement in Manila, and hence, by virtue of the law, their principals, the defendants other than the Trading Company, then knew that Reiss and Mitchell had no authority to execute it on behalf of the Trading Company, so that the case stood exactly as it would have been

if the defendants, other than the Trading Company, had consented in writing to be bound by their contract without the signature of the Trading Company, and had delivered it with that written consent to the plaintiff. Where the reason of a rule fails, the rule is inapplicable, and the unauthorized signature of the Trading Company to the contract did not prevent the creation, nor avert the validity of the obligation which the defendants, other than the Trading Company, expressly stated by their contract that they assumed. Thus in Smith v. United States, 2 Wall. 219, 229, 17 L. Ed. 788, all the sureties, including Smith, signed the bond in suit. Thereafter one of the sureties erased his name, and, while the bond was in that condition, all the sureties, except Smith, acknowledged its execution before the judge, and he approved it. The court held that all the sureties but Smith had waived the effect of the erasure, and were estopped from objecting to their obligation on account of it, but that Smith was released. In United States Fidelity & Guaranty Co. v. Haggart, 91 C. C. A. 289, 297, 163 Fed. 801, 809, and in Empire Surety Company v. Carroll County, 194 Fed. 593, in which the opinion was filed February 28, 1912, this court held that, even where principals whose names are recited in the bonds as obligors do not sign, sureties are not relieved from the obligation of the bonds where the absence of the signatures of the principals does not affect the measure of the liability the sureties intended to assume. This is a just and reasonable rule, and it is equally applicable where some of the sureties or guarantors fail to sign and the actual signers with knowledge of that fact deliver the contract. The defendants, other than the Trading Company, besought and finally persuaded the plaintiff to advance its money in reliance upon their written agreement to pay back $22,500 and interest if the purchasers at the contemplated sale failed to do so. The purchasers have failed to do so, and either the plaintiff or these defendants must now lose this money. It was these defendants and not the plaintiff who employed and trusted Reiss and Mitchell, and it was Reiss and Mitchell who, while acting as agents and executing the contract for these defendants, at the same time executed it for the Trading Company when they knew they had no authority to do so, and then delivered it as the contract of the defendants and obtained the money from the plaintiff by virtue of it. Where one of two parties must suffer from the fault of a third, he whose confidence and acts put it in the power of the third party to cause the loss ought to sustain it. It was Reiss and Mitchell who made the mistake, and it was the confidence and acts of the defendants that put it in their power to cause the loss. The enforcement of the contract charges the parties who caused the mistake, places the loss where the parties whose names were lawfully signed to the contract intended it should fall, imposes no heavier liability on these defendants than that which they intended to assume, and gives to the plaintiff the right and remedy under the contract in reliance upon which it parted with its money. A more extended discussion and perhaps a more persuasive presentation of the reasons for this result may be found in the opinion in Empire State Surety Co. v. Carroll County, supra. There is no in-

superable objection in the law or in reason to the enforcement of this contract of the defendants, and it ought to be enforced.

The true rule and the conclusion is that the failure of some of the obligors named in the body of a contract of guaranty or of suretyship to execute it, or their unauthorized execution of it, constitutes no defense to the liability of other obligors named therein who with knowledge that the former are not bound thereby execute and deliver the contract to the obligee, and thereby induce him to part with the consideration thereof.   Smith v. United States, 2 Wall. 219, 229, 17 L. Ed. 788; Russell v. Freer, 56 N. Y. 67, 71; Adams v. Bean, 12 Mass. 137, 7 Am. Dec. 44; Empire State Surety Co. v. Carroll County (C. C. A.) 194 Fed. 593; United States Fidelity & Guaranty Co. v. Haggart, 91 C. C. A. 289, 297, 163 Fed. 801, 809; St. Louis Brewing Ass'n v. Hayes, 38 C. C. A. 449, 97 Fed. 859; State v. Bowman, 10 Ohio, 445; City of Deering v. Moore, 86 Me. 181, 29 Atl. 988, 41 Am. St. Rep. 534; Pima County v. Snyder, 5 Ariz. 45, 44 Pac. 297; Douglas County v. Bardon, 79 Wis. 641, 48 N. W. 969; Gibbs v. Johnson, 63 Mich. 671, 30 N. W. 343; Trustees of Schools v. Sheick, 119 Ill. 579, 8 N. E. 189, 192; Woodman v. Calkins, 13 Mont. 363, 34 Pac. 187, 40 Am. St. Rep. 449; United States Fidelity & Guaranty Co. v. Union Trust & S. Co., 142 Ala. 532, 38 South. 177; Lovejoy v. Isbell, 70 Conn. 557, 40 Atl. 531; Johnson v. Johnson, 31 Ohio St. 131; San Roman v. Watson, 54 Tex. 254.   The contract was not void as against the defendants because the execution of it by the Trading Company was unauthorized.

[5] The court below concluded that the plaintiff could not recover in this action because in its opinion the contract in suit was not a contract of guaranty, but a contract to guarantee. Is this conclusion the necessary or logical result of the premise? If the agreement was a contract to guarantee, it was an agreement by the defendants that they would guarantee the payment to the plaintiff in annual installments of $3,750 of $22,500, and monthly interest at 7 per cent. per annum. This is an action to recover the installments of principal and interest which fell due between June 14, 1905, and October 14, 1907. If the contract was an agreement to guarantee the payment of these installments, it was a contract to make the guaranty within a reasonable time and the defendants have broken that agreement, for they have never made any subsequent guaranty, and for that breach the plaintiff is entitled to judgment against them for damages at least in the sum of the past due installments of principal and interest, and perhaps for the whole amount they agreed to guarantee. It is no defense to an action for the breach of an agreement to guarantee the payment of money at specified times that have passed before the action was commenced that the defendants have not only failed to pay the money, or to cause it to be paid, but that they have also failed to guarantee its payment.

But why was not the agreement a guaranty of payment? Counsel answer, because it provides that the amount of the advances of the plaintiff in excess of $40,000 to make the purchase "shall be secured by the joint and several personal guaranty" of the defendants, and

that, as soon as necessary powers of attorney arrive in Manila, a formal mortgage shall be made by those who acquire the property under the purchase on all this property to secure the payment of the $40,000, because on the day of the date of the contract Paul Reiss wrote a letter to Marshall, the agent of the plaintiff, to the effect that he guaranteed for and on behalf of the local defendants that the guaranties to be signed by them, Wolff and the Hilberts, would be promptly executed on arrival of a proper power of attorney from the United States, and because there was no principal debtor in existence the payment of whose debt was or could be guaranteed. But the plaintiff had refused to advance the money unless it received a guaranty of the payment of the amount advanced above $40,000 and the interest thereon Reiss and Mitchell had received authority from the defendants, other than the Trading Company (and hereafter the term "defendants" will be used to signify them only), not to agree to guarantee, but to guarantee that payment. The contract provided that it should be supplemented by the formal mortgage for $40,000, but it did not provide that it should be supplemented by any subsequent guaranty. The letter of Reiss is competent, not to modify the plain terms and effect of the agreement, but only to aid in the interpretation of the terms in it that may be ambiguous.

[6] A prospective principal debt and debtor that may be identified by a contract and by subsequent events are as effectual to sustain a guaranty, as an existing debt and debtor. Mead, Mason & Co. v. Watson, 57 Vt. 426; Browne on Statute of Frauds, § 163; Rogers v. Chambers, 112 Ga. 258, 37 S. E. 429; Brandt on Suretyship & Guaranty (3d Ed.) §§ 4, 66. And the debt for the prospective loan and those who should acquire the property under the proposed purchase constituted adequate prospective debt and debtors and were sufficiently identified by the written guaranty and the subsequent purchase to sustain it.

From the time the contract was made on June 14, 1905, until it was finally repudiated by the local defendants in July, 1907, all the parties to it by their acts in performance of it, by their letters and telegrams and by their words regarding it, interpreted it to be an executed guaranty by the defendants and none of them ever suggested the contrary, or that a subsequent guaranty was contemplated. Under that construction the plaintiff advanced its money to Reiss and Mitchell, and they purchased the property. Reiss wrote defendant Koehler in June, 1905, "Your joint guaranty stands at $22,500, and Koehler replied in the following July, "Should the concern in the near future produce any cash be sure to apply it on our guaranty." The finding of facts discloses no less than 17 references in letters and cablegrams of some of the parties, or of their agent Reiss, to this contract as a guaranty, or to the debt to the plaintiff as guaranteed. On October 25, 1906, the defendant, Hugo A. Koehler, wrote to the vice president of the defendant thus:

" * * * What we desire is an extension of time of payment of the amount now due under this guaranty up to the first of January next. Should, on the first of January next, all plans with respect to the Philippine Lumber and Development Company have not been consummated, we agree to pay with-

out further delay that portion of the guaranty which is now due under the terms of the guaranty entered into in Manila for and on our behalf by Mr. Paul Reiss. * * * "

And the plaintiff granted the extension.

[7] The practical interpretation of a contract by the parties to it while they are engaged in its performance, and before any controversy concerning it has arisen, is one of the most satisfactory tests of its meaning, and courts may generally adopt that construction with safety. Uinta Tunnel Min. & Trans. Co. v. Ajax Gold Mining Co., 141 Fed. 563, 73 C. C. A. 35; Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110; Housekeeper Publishing Co. v. Swift, 97 Fed. 290, 296, 38 C. C. A. 187; Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 578, 30 C. C. A. 260; Cleveland-Cliffs Iron Co. v. East Itasca Mining Co. 146 Fed. 232, 76 C. C. A. 598; Chicago Great Western Ry. Co. v. Northern Pacific Ry. Co., 101 Fed. 792, 42 C. C. A. 25. This practical interpretation which the parties gave to the contract is not inconsistent with its terms. The verb "to be" means to exist as well as to become. The former meaning signifies continuance in a present state, the latter a future entry into a different condition. The agreement of the parties that the excess of the plaintiff's advances "shall be secured" by the guaranty of the defendants is as consistent with the meaning that from the date of the contract it shall exist or stand secured by that guaranty as it is with the meaning that it shall subsequently become secured. The object of all construction is to ascertain and give effect to the intention of the parties, to the sense and meaning of their words upon which their minds met when they used them in the agreement. And, in view of the facts that the plaintiff had demanded a present guaranty as a condition precedent to its advance of the money, that the defendants authorized its agents to make such a guaranty, that the terms of the contract are consonant with the interpretation that they did make such a guaranty, that the plaintiff put that interpretation upon the agreement and in reliance upon it loaned its money, and that all the parties to the contract so construed it and acted upon that construction for more than two years, the conclusion is irresistible that, by the agreement, the defendants made a present guaranty of the payment to the plaintiff of the excess of its advances over $40,000, together with the interest thereon.

[8] Counsel for the local defendants argue that the contract is void under the statute of frauds because it is a special promise to answer for the debt, default, or miscarriage of another, because it was not to be performed within one year from its making and because it was not signed by the parties to be charged therewith, or by any person by them lawfully authorized. But where the main object of guarantors is not to answer for the debt, default, or miscarriage of another whose debt is guaranteed, but it is to obtain substantial benefits or advantages to themselves which actually inure to them, their guaranty is also their own original agreement, and no writing is essential to its validity under the statute of frauds. Mine & Smelter Supply Co. v. Stockgrowers' Bank, 173 Fed. 859, 863, 98 C. C. A. 229, 233, and

cases there cited; Davis v. Patrick, 141 U. S. 479, 487, 488, 489, 12 Sup. Ct. 58, 35 L. Ed. 826; Emerson v. Slater, 22 How. 28, 37, 38, 43, 44, 16 L. Ed. 360. This was the nature of the contract in suit. Moreover, if this contract had evidenced a collateral instead of an original promise of the defendants, it was sufficient. It was in writing, and was signed by persons lawfully authorized by the defendants to make it on their behalf. That is certain which may be made certain. The agreement clearly pointed out those who acquired the property under the proposed purchase as the prospective principal debtors, the subsequent course of the title to the property, and the writing identified them, and the terms of the agreement were clear and certain. The contract was not void under the statute of frauds.

The next objection of the local defendants to the enforcement of this contract is that it was never performed by the plaintiff: (a) Because, as they say, the contract provided that the advances which constituted the consideration for the contract were to be made to the defendants and they were made to Reiss and Mitchell. But the contract does not provide that the advances should be made to the defendants personally. It recites that the plaintiff has already advanced $48,500, more or less, in connection with the property of the Philippine Lumber & Development Company, none of which had been advanced to or for the defendants, that it had agreed to extend its advances up to $62,500, and that it had yet to advance $2,500 to enable the defendants to make a bid at the proposed sale. The defendants were in America, and Reiss and Mitchell, their agents, were in Manila. The extension of the advance was made at the request of Reiss and Mitchell and to them to enable them to bid at the sale in order that the main benefit of the purchase might flow to the defendants through these same agents as the assignees of the Trading Company and the trustees for its creditors. Reiss and Mitchell purchased and acquired the property by means of the plaintiff's advance and devoted it to this purpose without personal title or interest in themselves, and the plaintiff's advancement to them was in strict performance of the agreement. (b) Because the amount agreed to be advanced was the difference between $48,500 and $62,500 and the amount advanced was $62,500, $44,419.50 was paid out of this amount by the receiver of the Lumber Company, to whom it was paid for the purchase of the property, in order to satisfy the debt of the plaintiff secured upon the property, and $4,113.05 was paid to the plaintiff by Reiss and Mitchell in satisfaction of the unsecured part of its prior advance of $48,500 recited in the contract, so that Reiss and Mitchell had as counsel for the defendants' claim $4,113.05 less than the agreed amount with which to operate the plant they bought. But it was immaterial to the liability of the defendants whether the plaintiff advanced only $14,000 after the contract was made and retained its existing mortgage for $44,419.50 or advanced the $62,500, received back the $44,419.50 secured upon the property from the receiver, satisfied its old mortgage, and took a new one for $40,000 on the plant. There is nothing in the contract to the effect that Reiss and Mitchell or the defendants should retain and use to operate the plant they purchased $4,113.05 out of

the purchase price or the money advanced, and there was no breach of any obligation which the plaintiff assumed thereby in its receipt from Reiss and Mitchell of that amount after it had advanced the entire $62,500 to enable them to make the purchase of the property free of all liens and they had received from the receiver in the distribution of the purchase money, as they did, about 85 per cent. of the difference between the $44,419.50 and the $62,500 paid for the property. (c) Because the contract provides for an immediate advance of $2,500 and the plaintiff advanced $5,000. But this and all the plaintiff's advances were within the limit fixed by the contract, and were requested and received by Reiss and Mitchell, the agents of the defendants and the bidders at the sale. (d) Because the bid and purchase were not made by the defendants. But they were made by the defendants' agents for their benefit in the way contemplated when the contract was made, and they were within the true intent and meaning of the agreement, and were so accepted and used by the defendants and their agents. (e) Because the contract contemplated no disturbance of the existing mortgage, and yet it was paid off out of the $62,500 furnished by the plaintiff under the contract to make the purchase, and Reiss and Mitchell gave a new mortgage on the plant for $40,000. But the agreement expressly provided that the $40,000 should be secured after the purchase by a formal first mortgage on the property acquired, to be drawn by the solicitors of the plaintiff, and it could not be so secured without a satisfaction of the mortgage in existence when the contract was made. The plaintiff committed no breach of the obligation of the contract, but carefully performed it.

Finally, it is contended that the defendants were released from the obligation of their agreement: (1) Because Reiss in his letter to Marshall on June 14, 1905, agreed on behalf of the defendants that they would guarantee that all sums advanced by the plaintiff pending the arrival of a power of attorney should be repaid. But this letter was written on the same day as and before the guaranty in suit. Reiss had no authority to guarantee repayment of more than was advanced under this written guaranty. No more was advanced, and this letter itself provided that it should cease and be of no further effect, when the guaranties and agreements contemplated by the understanding between Reiss and Marshall were made and these guaranties were executed when the contract in suit was signed on that day. This letter did not modify the contract. (2) Because Reiss and Mitchell on behalf of their principals on June 30, 1905, made an agreement to pay, or to cause the receiver to pay, to the plaintiff $44,532.05, errors in the account excepted. But this agreement was not inconsistent with any terms of the contract in view of the fact that the plaintiff advanced the entire $62,500 to make the purchase. It was a mere stipulation of a part of the method of performing the contract which the agreement itself did not prescribe. It neither modified the guaranty nor released the defendants from their obligation to perform it.

All the propositions and arguments of counsel relating to the validity, construction, extent, and enforcement of the contract of June 14, 1905, have been deliberately considered, the more important of them

have now been discussed and the conclusion is that the defendants made a valid contract of guaranty of the payment of $22,500 and interest, and the plaintiff is lawfully entitled to the enforcement of that agreement.

[9] But counsel for the plaintiff insist that the local defendants ratified the entire contract, so that they are also liable for the interest on the $40,000 which their agents in excess of their authority undertook to bind them to pay. This question was not considered or decided by the referee or by the court below because they were of the opinion that the unauthorized signature of the Trading Company left all the defendants exempt from liability under the contract, and, considering the contract in that view, the referee was of the opinion that the local defendants had, and the court that they had not, ratified it. The facts from which the referee deduced that conclusion are presented in the finding and they are strong and persuasive. They show that the defendants knew as early as July, 1905, that they had guaranteed the payment of $22,500; that they knew as early as October, 1906, that they had guaranteed the payment of some interest; that with this knowledge they agreed, in that month, in consideration of an extension of the time of payment of the guaranty, "to pay without further delay that portion of the guaranty which is now due under the terms of the guaranty entered into in Manila for and on our behalf by Mr. Paul Reiss"; that they repeatedly negotiated with third parties to sell the property purchased, caused the title to one portion of it to be vested, and held in the name of one of them and in January, 1907, in response to repeated demands for payment, remitted to the plaintiff $7,500, and wrote it, among other things, that, when they ascertained the amount of interest due, they would cover that by another draft. But whether or not the local defendants ratified the unauthorized stipulation in the contract to guarantee the payment of interest on the $40,000 after the law is established that they made a valid contract to guarantee the payment of $22,500 and monthly interest thereon presents a very different question from that decided by the referee and the court below because the acts of alleged ratification and estoppel found by the court may and must, in the absence of proof that they were referable to the unauthorized part of the contract, be referred to the authorized part of it. The authority to make the contract was in letters and cablegrams which were equally well known to the plaintiff, to the defendants, and their agents in Manila before the agreement was signed. Hence no moral duty and no civil obligation was imposed on the defendants to perform, to ratify, or to give notice that they would not perform or ratify the unauthorized guaranty of the payment of the interest on the $40,000, and the burden was on the plaintiff to prove the ratification it alleged. "Ratification of an act of an agent previously unauthorized must, in order to bind the principal, be with full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded on mistake or fraud." Bennecke v. Insurance Company, 105 U. S. 355, 360, 26 L. Ed. 990; Combs v. Scott, 12 Allen (Mass.) 493, 497. Reiss, the agent of the local defendants,

knew the terms of the contract, and was aware that it contained this unauthorized guaranty of interest in June, 1905, when he made it. In August or September, 1906, after he had returned from Manila, the local defendants hired him to go to New York and procure an extension of the time for the payment of their guaranty, and counsel for the plaintiff argue that his knowledge of the unauthorized guaranty acquired in 1905 must be imputed to the defendants in the transaction of 1906.

[10] It is, however, only when the knowledge acquired by an agent in a previous transaction is legally presumed or clearly shown by circumstances, or other evidence, to have been in his mind at the time of the subsequent transaction, that it can be imputed to his principal therein. The Distilled Spirits, 11 Wall. 356, 357, 20 L. Ed. 167. The time between June, 1905, and August, 1906, was too long to sustain a legal presumption that the unauthorized stipulation was in his mind at the later date. There was no finding of any facts which show that any question of interest ever arose, or of any fact to the effect that Reiss ever thought of this unauthorized stipulation in the later transaction. None of the defendants ever saw the contract, or a copy of it, until January, 1907, there is no finding of any fact indicating that the question whether or not they were liable for interest on the $40,000 ever arose, or came to their attention in any way, or that they ever noticed that there was a clause in the contract concerning it prior to January 27, 1907, or that after that date they ever performed any act or made any sign of ratification, or of concession of its validity. In this state of the case the facts found fail to show that the defendants had full knowledge of all the material facts relating to this unauthorized stipulation prior to January 27, 1907, and they do not sustain the legal conclusion that they ratified the guaranty of the payment of the interest on the $40,000.

For the same reason, and also because the plaintiff had the same knowledge and the same means of knowledge as the defendants regarding the lack of the authority of Reiss and Mitchell to make the unauthorized guaranty, and because the facts found fail to show that the plaintiff disadvantageously changed its position in reliance upon any acts or words of the defendants conceding the validity of that guaranty, the local defendants are not estopped from repudiating it, and the plaintiff cannot recover interest on the $40,000.

[11] A single question remains. May the local defendants recover on their counterclaim the $7,500 they remitted to the plaintiff on January 14, 1907? When that remittance was made, they owed the plaintiff on their guaranty $22,500 and monthly interest thereon from July 14, 1905, to January 14, 1906, and this interest and $3,750 of the principal they guaranteed was past due. The plaintiff had demanded of them this interest and installment, and also the installment of $3,750 of the $40,000 which had become due on June 14, 1906, and in response to this demand the $7,500 was remitted. The defendants remitted therefore about $3,000 more than the amount of their debt past due at that time, but another installment of $3,750 of the $22,500 fell due on June 14, 1907, and this second installment absorbed the

remainder of the $7,500, and left a balance of past-due principal and interest owing by the defendants before this action was commenced in October, 1907. The finding of facts leaves no doubt that the defendants remitted this money to pay the amount they believed to be past due on their guaranty; that they were then anxious to make some arrangement with the plaintiff to induce it to bring a suit against all the defendants, so that Wolff and the Hilberts might thereby be compelled to pay their proportion of the amount owing under the guaranty; that for this purpose they requested the plaintiff to accept the $7,500 as a deposit as evidence of their good faith until one of them could arrive in New York on the following Friday; that the plaintiff acceded to this request; that the defendants never demanded the repayment of any of this money until after the second installment of $3,750 fell due on June 14, 1907; and that in October, 1907, before this suit was commenced, the plaintiff credited the $7,500 to the defendants, and applied it in part payment of their matured indebtedness to it. Counsel indulge in a discussion of the questions whether or not this $7,500 remained as a special deposit after the visit of Mr. Koehler to New York in January, 1907, to arrange for a suit against all the defendants, and whether or not a voluntary payment by mistake under the circumstances of this case may be recovered. These issues might have been material if the legal conclusion of the court below that the defendants were free from all liability under their original contract could be sustained, but they are no longer so. The sum of $7,500 was voluntarily remitted by debtors to their creditor in response to the latter's demand of payment of their debt. It remained in the creditor's possession without demand of return until the past-due indebtedness of the defendants had become more than the amount of the remittance. The unavoidable result is that, whether the plaintiff held it as a special deposit to await the result of further negotiation concerning an action by it against all the defendants or as a payment on the guaranty, the defendants hd no right to recover it back until they paid their overdue obligation. The plaintiff, after the defendants' matured obligation exceeded the $7,500, could lawfully apply it to the payment of that debt. The facts found do not warrant the conclusion that the $7,500 was charged with any trust in the hands of the plaintiff other than a trust to apply it to pay the debt of the local defendants at some indefinite time, so that the deposit stood in no stronger position than a general deposit, and a depositor cannot recover his general deposit of his creditor after his debt to him in excess of that deposit has become due, unless he first pays that debt. Durkee v. National Bank of Florida, 102 Fed. 845, 849, 42 C. C. A. 674; People v. St. Nicholas Bank, 44 App. Div. 313, 319, 60 N. Y. Supp. 719; Jordan v. National Shoe & Leather Bank, 74 N. Y. 467, 473, 30 Am. Rep. 319; Jackson v. McKnight, 17 Hun (N. Y.) 2; Smith v. Eighth Ward Bank, 31 App. Div. 6, 9, 52 N. Y. Supp. 290; Second National Bank of Lafayette v. Hill, 76 Ind. 223, 226, 40 Am. Rep. 239; Aurora National Bank v. Dils, 18 Ind. App. 319, 48 N. E. 19, 22. The defendants are entitled to no recovery on their counterclaim.

The sum of the whole matter is that the defendants, Hugo A. Koeh-

ler, Henry Koehler, Jr., and the American Brewing Company, are liable to the plaintiff on their guaranty contained in the contract of June 14, 1905, to the amount of $22,500 and monthly interest thereon at 7 per cent. per annum, according to the terms of that contract; that the plaintiff is entitled to a judgment against these defendants in this action for the matured installments of that $22,500, the matured installments of monthly interest thereon, and interest on those respective installments at 6 per cent. per annum, less a credit of $7,500 as of the date of January 14, 1907. The judgment below must accordingly be reversed, and the case must be remanded to the court below, with instructions to enter a judgment in accordance with the views expressed in this opinion; and it is so ordered.