# DAVIS *v.* PATRICK.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

No. 984. Argued October 22, 23, 1891. — Decided November 9, 1891.

In determining whether an alleged promise is or is not a promise to answer for the debt of another, the following rules may be applied : (1) if the promissor is a stranger to the transaction, without interest in it, the obligations of the statute are to be strictly upheld : (2) but if he has a personal, immediate and pecuniary interest in a transaction in which a third party is the original obligor, the courts will give effect to the promise.

The real character of a promise does not depend altogether upon form of expression, but largely upon the situation of the parties, and upon whether they understood it to be a collateral or direct promise.

When, in an action to recover on a contract, testimony is admitted without objection, showing the alleged contract to have been made, but on a day different from that averred in the declaration, and the court directs a verdict for the defendant without amendment of the declaration, such ruling is not erroneous by reason of the variation.

THE case was stated by the court as follows :

This case was commenced on the 24th day of November, 1880, by the filing of a petition in the District Court of Knox County, Nebraska. Subsequently it was removed to the Circuit Court of the United States, and at the May term, 1883,

of that court a judgment was rendered in favor of the plaintiff. That judgment was reversed by this court, at its October term, 1886. *Davis* v. *Patrick*, 122 U. S. 138. A second trial in January, 1890, resulted in another verdict and judgment for the plaintiff, and again the defendant alleges error. The petition counts on two causes of action. No question is made by counsel for plaintiff in error with respect to the first count or the rulings thereon — the only error alleged being in reference to the second count. That count is for the transportation of silver ore from the Flagstaff mine, in Utah Territory, to furnaces at Sandy, in the same Territory. In the first trial it was claimed that Davis, the defendant, was the real owner of the Flagstaff mine, and therefore primarily responsible for all debts contracted in its working. The relations between Davis and the Flagstaff Mining Company were disclosed by a written agreement, of date December 16, 1873. By that agreement it appeared that Davis, on June 12, 1873, had advanced to the company £5000, at the rate of six per cent interest, a sum then due; that it had sold to Davis and agreed to deliver at the ore-house of the company, free of cost, 5195 tons of ore, of which it had only then delivered 200 tons, although Davis had paid in full for the entire amount. The agreement also recited that Davis was to advance an additional amount, if needed, not exceeding £10,000. It then provided that the mine should be put under the sole management of J. N. H. Patrick, to be worked and controlled by him until such time as the ore sold had been delivered and the sums borrowed had been repaid, with interest. This control was irrevocable, save at the instance of Davis. Coupled with this agreement was a full power of attorney to Patrick. This court held that such contract established between Davis and the mining company simply the relation of creditor and debtor, and did not make him in any true sense the owner. For the erroneous rulings of the trial court in this respect the judgment was reversed. In the second trial, this construction of the relations of Davis to the Flagstaff Mining Company was followed by the court, and the jury instructed that the contract put in evidence between Davis and the mining company created simply the rela-

tions of creditor and debtor, and did not make the former liable for expenses created in working and operating the mine; and the trial proceeded upon the theory that during the time the services sued for were being rendered Davis was the party mainly and pecuniarily interested in the working of the mine, and that he assumed to Patrick a personal responsibility for such services; and the real question tried was whether Davis's promises were collateral undertakings to pay the debts of another, and void because not in writing.

[In the opinion of the court, *post,* 485–487, some of the material evidence at the last trial is set forth.]

*Mr. J. M. Woolworth* for plaintiff in error.

The case was put to the jury upon the words of an original and absolute promise. It was said to them, if Davis agreed to pay for the services, and if he agreed to pay the account, and if he agreed to pay for the work, and so on, he is liable. This was error, whether the proof shows that the form of expression was "I will see you paid," or "I will be responsible." Both forms have in law a different meaning and effect from the one, "I will pay you." It is elementary that the words "I will see you paid" form a collateral promise. On this point we must look to the statute of Nebraska, and its construction by the Supreme Court of that State. *De Wolf* v. *Rabaud,* 1 Pet. 476.

The statute in Nebraska, as that in New York, (considered in *De Wolf* v. *Rabaud,*) is substantially "a transcript of the 29th of Charles 2, c. 3." It is as follows: "In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing and subscribed by the party to be charged therewith: . . . *Second,* every special promise to answer for the debt, default or misdoings of another person." Comp. Stats. c. 32, § 8.

The cases upon the statute are as follows: *Rose* v. *O'Linn,* 10 Nebraska, 364. The servant of A was injured by the wrongful act of B. A physician was called in by B, who went to A's house, where the servant lay, and performed medical services; immediately after which A told him that B was

responsible for the accident, adding : "But you need not be at all alarmed, I will see that you are paid;" and the physician continued treating the patient until he was cured. Mr. Justice Cobb deals with the question as one arising upon these words, "I will see that you are paid," and considers the promise as within the second class of cases mentioned by Chief Justice Kent in *Leonard* v. *Vredenburgh*, 8 Johns. 29 ; *S. C.* 5 Am. Dec. 317; that is, as a collateral undertaking. See also *Morrissey* v. *Kinsey*, 16 Nebraska, 17; *Waters* v. *Shaffer*, 25 Nebraska, 225.

These cases dispose of the question and show the error into which the court fell in perverting a promise to see Patrick paid into a promise to pay him. And this is the old law. In *Watkins* v. *Perkins*, 1 Ld. Raym. 224, the Chief Justice said : "If A promise B, being a surgeon, that if B cure D of a wound, he will see him paid; this is only a promise to pay if D does not, and therefore it ought to be in writing, by the statute of frauds."

*Matson* v. *Wharam*, 2 T. R. 80, is the leading case on this subject. The defendant had applied to one of the plaintiffs, to know if they were willing to serve one R. C. with groceries, and on his replying that they did not know R. C., the defendant said, "If you do not know him, you know me, and I will see you paid." The goods were subsequently sent to R. C., and charged to him. Application was made to him for payment, and he not responding, and the defendant refusing to pay, the action was brought for goods sold and delivered to the defendant. Mr. Justice Buller, reviewing some previous cases, said : "The authorities are not now to be shaken ; and the general line now taken, is that if persons for whose use the goods are furnished be liable at all, any other promise by a third person to pay that debt, must be in writing; otherwise it is void by the statute of frauds." And judgment was given to the defendant, without hearing his counsel. See also *Brown* v. *Bradshaw*, 1 Duer, 199; *Hill* v. *Raymond*, 3 Allen, 540; *Williams* v. *Corbet*, 28 Illinois, 262; *Greene* v. *Burton*, 59 Vermont, 423; *Birchell* v. *Neaster*, 36 Ohio St., 331; *Simpson* v. *Hall*, 47 Connecticut, 417; *Wagner* v. *Hallack*, 3 Colorado, 176. They all agree with the Nebraska cases, that the prom-

ise, "I will see you paid," is a collateral one and within the statute.

From these words, I pass to consider the other form of the promise, which Patrick put into Davis's mouth; namely, that he would be responsible for the debt.

*Anderson* v. *Hayman*, 1 H. Bl. 120, was upon a promise by a father in these words: "I will be bound for the payment of the money as far as £800 or £1000," for goods sold and delivered to the son. Payment was demanded of the son, but he having become bankrupt, plaintiff sued the father. The verdict being for the defendant, the court upon a rule *nisi* for a new trial, held that this promise not being in writing, was void by the statute of frauds.

In *Tileston* v. *Nettleton*, 6 Pick. 509, the defendant was the commanding officer of a militia company, and also a member of the committee on arrangements for a celebration of the Fourth of July, which included a public dinner provided by the plaintiff. The members of the company with other citizens partook of the dinner, and while they were eating the plaintiff sent two persons to collect one dollar from each of those present to pay for his dinner, etc. Whereupon the defendant stopped them and said that they need not call upon the members of the company, as he would be responsible for them; to which the plaintiff assented, and no money was collected from them. The evidence was submitted to the jury, which found for the defendant; and the court, affirming the judgment, stated that the members of the company were the original debtors, and might have been sued separately upon an implied promise; and their original liability proved that the defendant's engagement was only collateral.

*Walker* v. *McDonald*, 5 Minnesota, 455, was an action for rent for which the defendant promised to be "responsible," which was held to be a collateral promise.

In *Walker* v. *Richards*, 41 N. H. 388, it was held that a promise to be "accountable" for goods sold and delivered to a third person was within the statute.

No circumstance testified to by any of the witnesses shows that either of the parties, the company, Patrick or Davis con-

sidered Davis liable upon an original promise, nor in fact liable at all until Patrick ceased to haul the ores. Everything, on the other hand, shows that Davis's liability was not upon an original promise. These circumstances entitled Davis to a direction from the court to the jury, as requested by him in his third and fourth requests, that he was not liable as upon an original promise.

The cases are all to the effect that when the words of a promise are equivocal, the question upon all the circumstances must be submitted to the jury. *Anderson* v. *Hayman*, 1 H. Bl. 120; *Darnell* v. *Tratt*, 2 Car. & Payne, 82; *Dixon* v. *Frazee*, 1 E. D. Smith, 32.

The case at bar differs from *Emerson* v. *Slater*, 22 How. 28, in all material circumstances. When the alleged promise was made, the Flagstaff Company was solvent, and possessed of valuable properties, none of which had been placed in the hands of Davis. Patrick never stopped or threatened to stop working for the company; all he says is that but for Davis's promise he would have forced him to pay. He had not taken possession of the company's property so as to exclude it, or any contractor from doing the work. The promise was not in its form absolute and original, but contingent and collateral. These are material distinctions.

There are several cases classified according to their circumstances, which illustrate the distinction taken above, between *Emerson* v. *Slater* and the case at bar; that when the alleged promise was made by Davis, Patrick had not put either himself or Davis in a position which made his employment necessary. *Clay* v. *Walton*, 9 California, 328; *Doyle* v. *White*, 26 Maine, 341; *S. C.* 45 Am. Dec. 110; *Ames* v. *Foster*, 106 Mass. 400; *Gill* v. *Herrick*, 111 Mass. 501.

Another set of cases is where the new promisor has agreed to pay a lien upon property where the protection of his interest called for the discharge of the lien. *Fullam* v. *Adams*, 37 Vermont, 391.

*Mr. John L. Webster* for defendant in error. *Mr. Nathaniel Wilson* was with him on the brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

That Davis was interested in having the ore transported to the furnaces is clear. He was interested in two respects: First, as to the 4995 tons to be delivered to him at the ore-house, it being his property when thus delivered, any subsequent handling was wholly for his benefit; and in respect to the balance, as the transportation was one step in the process of converting the product of the mine into money, it would help to pay the debt of the company to him. Davis, therefore, was so pecuniarily interested in, and so much to be benefited by, the prompt and successful transportation of the ore, that any contract which he might enter into in reference to it was supported by abundant consideration. We proceed, therefore, to inquire what he said and did. After the execution of the papers, the newly appointed manager took possession of the mine; and in the fore part of 1874 the plaintiff commenced the transportation of the ore under a contract with the agent of the manager. The business was carried on in the name of the mining company. The plaintiff understood that Davis was interested in the matter, though not informed as to the extent of the interest, or the terms of the agreement between him and the mining company. In the fall of 1874 Davis came to Utah to examine the property. He was introduced by the manager to the foreman of plaintiff, in the latter's presence, as the boss of the mine, to which Davis assented. After this, plaintiff, who had not received his pay in full for the services already rendered, had an account made up showing the balance due him, and presented it to Davis. His testimony as to the conversation which followed is in these words: "I showed it to Mr. Davis and told him I was not getting my money, and Mr. Davis said my account was all right and he would be personally responsible to me for the money, and for me to go on as I had been doing and draw as little money as I could get along with to pay the men and the running expenses, and he would see that I got every dollar of my money." The plaintiff's cashier, who was present at this conversation, gives this as his recollection of the conversation:

"Q. In that conversation state what Mr. Davis said about being responsible to A. S. Patrick for that account.

"A. He stated to Mr. Patrick in my presence that he would personally be responsible for that account.   He says: 'You know, Al., I practically own this mine, but money is scarce and we must get what we can out of the mine.'   He says we are making large expenditures for improvements, and he says you shall have all the money you want to pay your men and expenses, but you must wait for the balance, and I will see that you are paid.

"Q. What did he say in that connection to A. S. Patrick about continuing on in the hauling of the ores?

"A. He requested him to continue in the hauling of the ores.   He requested him to do it.

"Q. In response to Mr. Davis to that request, what did Mr. Patrick say?

"A. He said to Mr. Davis if he would guarantee him to be paid he would continue to work, and Davis said he would see him paid."

After this, the plaintiff continued the work of transportation until the fall of 1875, receiving such payments from time to time as to extinguish the amount due him at the date of this conversation, and leaving a balance more than covered by the work done in 1875, and it is only for work done after these promises that this recovery was had and in respect to which the questions presented and discussed arise.   The plaintiff testified to another conversation, in September, 1876, in the city of New York.   His account of that conversation is given in these words: "Plaintiff told Davis that his brother and himself were hard up for money, and wanted to know if Davis would not give them some money on the 'Flagstaff' account, for hauling the ores.   Plaintiff had his account with him and showed it to Davis.   Davis said the whole of the account was all right, and he proposed to pay the account, and said he would pay the plaintiff.   Plaintiff said to Davis that if he would give him some money on the account it would help him out.   Davis said he had some securities in London which he was going to sell, and would have some money in a few days

and would give plaintiff $5000 on the account. Plaintiff said if the money was going to be there in a few days he would wait for it, but Davis said: 'No; you go home and I will pledge you my word that I will telegraph the money to you to the First National Bank by the first of October.'"

And, again, he testified to an interview in 1877 with Davis, in the city of Omaha, in the presence of other parties, in which he said: "Davis, you promised all along to pay me that money," and Davis replied, "I believe I did."

This testimony of plaintiff as to conversations with defendant is corroborated by other witnesses and contradicted by none. It must therefore be accepted as presenting the facts upon which this case must be determined. Were these promises binding upon Davis, or of no avail to the plaintiff because not in writing? Were it not for the statute of frauds there would be no question, for obviously there was both promise and consideration. Defendant relies upon that provision of the statute of frauds which forbids the maintenance of an action "to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing," etc. The purpose of this provision was not to effectuate, but to prevent, wrong. It does not apply to promises in respect to debts created at the instance and for the benefit of the promisor, but only to those by which the debt of one party is sought to be charged upon and collected from another. The reason of the statute is obvious, for in the one case if there be any conflict between the parties as to the exact terms of the promise, the courts can see that justice is done by charging against the promisor the reasonable value of that in respect to which the promise was made, while in the other case, and when a third party is the real debtor, and the party alone receiving benefit, it is impossible to solve the conflict of memory or testimony in any manner certain to accomplish justice. There is also a temptation for a promisee, in a case where the real debtor has proved insolvent or unable to pay, to enlarge the scope of the promise, or to torture mere words of encour-

agement and confidence into an absolute promise; and it is so obviously just that a promisor receiving no benefits should be bound only by the exact terms of his promise, that this statute requiring a memorandum in writing was enacted. Therefore, whenever the alleged promisor is an absolute stranger to the transaction, and without interest in it, courts strictly uphold the obligations of this statute. But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal, immediate and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise. As said by this court in *Emerson* v. *Slater*, 22 How. 28, 43 : " Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability." To this may be added the observation of Browne, in his work on the statute of frauds, section 165 : " The statute contemplates the mere promise of one man to be responsible for another, and cannot be interposed as a cover and shield against the actual obligations of the defendant himself." The thought is, that there is a marked difference between a promise which, without any interest in the subject-matter of the promise in the promisor, is purely collateral to the obligation of a third party, and that which, though operating upon the debt of a third party, is also and mainly for the benefit of the promisor. The case before us is in the latter category. While the original promisor was the mining company, and the undertaking was for its benefit, yet the performance of the contract enured equally to the benefit of Davis and the mining company. Performance helped the mining company in the payment of its debt to Davis, and at the same time helped Davis to secure the payment of the mining com-

pany's debt to him; and as the mining company was apparently destitute of any other property, and the payment of its debt to Davis therefore depended upon the continued and successful working of this mine, and as the control and working of the mine had been put in the hands of Davis so that he might justly say, as he did, " I am practically the owner," it follows that he was a real, substantial party in interest in the perform-ance of this contract.   His promise was not one purely collat-eral to sustain the obligations of the mining company, but sub-stantially a direct and personal one to advance his own inter-ests.  While the mining company was ultimately to be benefited, Davis was primarily to be benefited by the transportation of the ore, for thereby that debt, which otherwise could not, would be paid to him.   He, therefore, in any true sense of the term occupied not the position of a collateral undertaker, but that of an original promisor, and it would be a shadow on justice if the administration of the law relieved him from the burden of his promise on the ground that it also resulted to the benefit of the mining company, his debtor.

Counsel for Davis place stress on the form of expression attributed by Patrick to Davis, to wit: " I will be personally responsible; I will see you paid;" and contends that the im-port of such language is that of a collateral promise.   There is force in this contention, as it implies that some one else was also bound, but the real character of a promise does not depend altogether upon the form of expression, but largely on the sit-uation of the parties; and the question always is, what the parties mutually understood by the language, whether they understood it to be a collateral or a direct promise.   Patrick declares he understood it to be a direct promise, and acted on the faith of it.   That Davis understood it in the same way, is evidenced not only from the circumstances surrounding the parties at the time, but from the fact that in a subsequent inter-view, when charged to have always promised to pay this debt, he admits that he believes that he did.   The plaintiff, believing that Davis was, as he said, practically the owner, the party primarily to be benefited by the conversion of the products of the mine into money, understood that Davis was making an

original promise to pay for the work which he might do, and upon such promise he might surely rely as an original promise, at least for any work done thereafter.

The merits of the case, therefore, as disclosed by the testimony were with Patrick, and the judgment in his favor was right. It is objected that the court in its instructions spoke of Davis as an original promisor, as one promising to pay the debt, and not as one promising to be responsible for the debt, or to see it paid. But as Davis, in the second conversation promised to pay, and in the third admitted that he had always promised to pay the debt, we cannot think that the court misinterpreted the scope and effect of his words. It is not probable that the parties to this transaction understood the difference between an original and a collateral promise. We must interpret Davis's promises in the light of the surroundings, and of his subsequent admissions, and in that light we cannot think that the court erred in its construction thereof; and if the jury believed that he had made such promises, we cannot doubt that the verdict should have been as it was.

It is also objected, that the court erred in not directing a verdict for defendant upon the ground of a departure from the allegations of the petition. That counts on an original employment by Davis, in 1873, while the testimony shows that the original employment was by the mining company, and that the promise of Davis was made in the fall of 1874, and after Patrick had been at work for months for the mining company. As no objection was made to the admission of testimony on this ground, and as an amendment of the petition to correspond to the proof would involve but a trifling change, we cannot see that there was any error in the ruling of the court. If objection had been made in the first instance, doubtless the court would, as it ought to have done, have permitted an amendment of the petition. There was no surprise, for the facts were fully developed in the former trial.

Upon the record as presented, we think that the verdict and judgment were right, and as no substantial error appears in the proceedings the judgment is

*Affirmed.*

The CHIEF JUSTICE, MR. JUSTICE BRADLEY and MR. JUSTICE GRAY did not hear the argument or take part in the decision of this case.