## BELL v. CASCADEN.

(Fourth Division. Fairbanks. January 17, 1918.)

No. 2313.

1. **Frauds, Statute of** ⊜⇒23(1), 56(8)—Contracts.

Plaintiff gave one D. G. McCarty an option in writing to purchase certain mining property for the sum of $10,000. Before payment certain difficulties arose between McCarty and the defendant in relation to the same property. Defendant informed plaintiff that he (defendant) could settle and adjust his difficulties with McCarty, providing plaintiff would reduce the option price to McCarty in the sum of $5,000. Plaintiff reduced said option price to McCarty in that sum upon defendant's promise to pay said amount to him as soon as McCarty paid to defendant certain sums owing to defendant from McCarty and payable during the summer of 1916. McCarty paid said moneys to defendant in the summer of 1916, but defendant refused to pay plaintiff, and on this suit pleaded the agreement was void under the statute of frauds. *Held*, the contract was not barred by the statute of frauds.

2. **Frauds, Statute of** ⊜⇒47—Contracts.

Subdivision 1 of section 1876, Compiled Laws of Alaska 1913, applies only to agreements which, by their terms, are not to be performed within a year, and do not apply because they may not be performed within that time. In other words, to make a parol contract void, it must be apparent that it must be the understanding of the parties that it was not to be performed within a year from the time it was made.

3. **Frauds, Statute of** ⊜⇒33(1)—Contracts.

Where the main purpose of an oral agreement is to subserve some purpose of the promisor, involving either a benefit to himself or damage to the other, his promise is not within the second subdivision of the Alaska statute of frauds (section 1876, Compiled Laws of Alaska 1913), although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability.

The plaintiff alleges in his complaint that prior to the month of February, 1915, he had acquired certain mining properties in the Fairbanks (now Tolovana) precinct, Fourth judicial division, and on or about the 14th day of February, 1915, gave to D. G. McCarty an option to purchase said properties for the sum of $10,000; that before the deferred payments fell due, and were paid, certain difficulties arose be-

⊜⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tween the said McCarty and the defendant herein; that the defendant informed plaintiff that he, the defendant, could settle and adjust his differences with McCarty, providing plaintiff would reduce the option price above mentioned in the sum of $5,000; that plaintiff reduced said option price in the sum of $5,000 upon defendant's promise to repay said amount to him as soon as the said McCarty paid to defendant certain moneys owing to said defendant by said McCarty and payable during the summer of 1916; that said McCarty during the summer of 1916 paid the defendant a sum in excess of $5,000, and thereupon said sum of $5,000 became due, owing, and payable to plaintiff; that plaintiff has demanded payment; and that no part of said sum has been paid, save and except the sum of $500. Wherefore plaintiff prays for judgment in the sum of $4,500, together with interest from the 1st day of October, 1916.

The defendant denies the allegations of the complaint, and for a further and affirmative defense alleges that no note or memorandum in writing was made and subscribed to by defendant, expressing any consideration for the alleged agreement between plaintiff and defendant described in plaintiff's complaint, and is therefore void under the statute.

By stipulation the case was tried by the court without a jury.

LeRoy Tozier, of San Francisco, Cal., and McGowan & Clark, of Fairbanks, for plaintiff.

Morton E. Stevens, of Fairbanks, and A. R. Heilig, of Portland, Or., for defendants.

BUNNELL, District Judge.  In considering the evidence in the case, I have kept in mind the fact that much of it was admitted for limited purposes, and that on the important points it has been highly contradictory.  It has therefore been weighed and considered with due regard to all the safeguards under which a case must be submitted to a jury under the provisions of the statute, and it has in addition been subjected to such tests as experience naturally suggests to the trier.  No particular difficulty has been experienced in arriving at the facts in the case.

On the 14th day of March, 1915, the plaintiff entered into a written agreement, called by the parties thereto an option,

with D. G. McCarty, whereby he granted unto the said Mc-Carty, for the consideration of $1, the exclusive right to purchase all of his (plaintiff's) rights and title in and to certain placer mining claims, including a one-half interest in and to the Totem Fraction, all being located in the Fairbanks (now Tolovana) recording precinct, Fourth judicial division, territory of Alaska. The purchase price was fixed at $10,000, of which $200 was paid upon the signing of the instrument, and $9,800 was to be paid on or before the 1st day of October, 1916. The agreement was quite inartificially drawn, but it seems to have been considered as an option contract by the parties thereto. It was acknowledged before a notary public on the 21st day of April, 1915.

The Leitrim Association placer mining claim, off which the Totem Fraction was staked by the plaintiff, was located on or about the 30th day of November, 1914, by the defendant and Joe Sherry, under a prospecting agreement whereby the plaintiff owned an equal interest with the defendant, and Pat O'Connor owned an equal interest with Joe Sherry. By agreement with defendant, December 16, 1914, the plaintiff entered into a prospecting venture for the period of one year, under which agreement all properties acquired were to be equally divided. While this agreement was in force and effect, plaintiff, with the consent of the defendant—both believing the Leitrim to be in excess of 40 acres—staked the Totem Fraction, and it was an undivided one-half interest in this Totem Fraction that the plaintiff included in his option agreement with McCarty. In listing the properties to be the subject of the option contract to McCarty, plaintiff contended that he owned a quarter interest in the Leitrim. Defendant stated to McCarty that plaintiff was entitled to a quarter interest in the Leitrim, and that he (defendant) would try to get it from Sherry, and that if he (defendant) did not get this interest from Sherry he (defendant) would make it good to McCarty. It also appears that plaintiff failed to do the required development work on the Totem Fraction and the same was relocated by McCarty. The evidence also discloses the fact that the development work done by plaintiff and defendant for the Leitrim claim was actually performed on the Triangle Fraction, located prior to the location of the Leitrim and overlapped in part by the Leitrim. Other reasons

for complications developed, by finding that the Leitrim as originally staked was not excessive in area; that McCarty was relocating it, and desisted at the request of O'Connor, and allowed O'Connor to do development work and make a discovery by driving a tunnel into the Leitrim from a shaft off the Leitrim.

O'Connor testified that he saw McCarty placing stakes on the Leitrim; that he went to him and protested against the "jumping" of the Leitrim and the staking of the Totem Fraction; and that about two hours later he had a conversation with the defendant. In reply to this question, "Just tell when you saw him [the defendant], and where, and who was present, and what was said as regards anything about the Leitrim claim or the Totem Fraction," he answered:

"Dave and I were alone when we had the conversation. I saw Cascaden [the defendant], and told him about the stakes being moved, and Cascaden told me that he told Bell to stake a fraction, and thought there was a fraction there when he told Bell to stake it. I told Cascaden there was not a fraction there; that the stakes would have to be moved back; and that McCarty demanded $5,000 knocked off the purchase price of the property that he bought from Bell if he moved the stakes back. And Cascaden said: 'I will see Bell and fix that up all right. You leave that to me. I will handle Bell.' So I said: 'All right, I would.'"

The plaintiff, after testifying that he had a conversation with the defendant in the month of May, 1915, in his tent on Discovery, at the time the defendant came there one night with two other parties and wanted plaintiff to prepare a lunch, said:

"I went outside to get cooled off, as it was hot in the tent, and Cascaden came out and put his arm around my shoulder, and he says, 'Albert, I want you to be good to me.' I says, 'What is it, Dave?' He says, 'The Leitrim has been jumped.' I says, 'Why was the Leitrim jumped?' He says, 'Dan McCarty has jumped the Leitrim.' I says, 'On what ground did he jump the Leitrim?' He says, 'The drill hole they put down was on a little fraction outside of the Leitrim.' He says, 'The only way we can save the Leitrim is for you to give up the fraction and $5,000 on the option price.' And Mr. Cascaden said he would make the deficiency good to me as soon as Dan McCarty paid him what he owed him. I asked him: 'How much does he owe you?' He says, 'He owes me eleven thousand dollars.'"

"Q. Was there any other agreement between you that night,

when he told you that he wanted you to knock $5,000 off your price to McCarty? A. He said he would fix up and give me $1,000.

"Q. When and how was that $1,000 to be paid? A. It was to be paid by a note, and the proceeds were to come out of the royalties out of the clean-ups on the Leitrim."

The so-called note referred to was introduced in evidence as Plaintiff's Exhibit D. It is poorly written in pencil, signed by defendant and Pat O'Connor, and is in the nature of an order for the payment to the plaintiff of royalties from the Leitrim in the sum of $1,000. This instrument reads:

"We the undersigned hereby assign and deliver to one Albert Bell twelve and one-half per cent. of all royalties [Note.—The word 'royalty' has an ink line run through it, and the words interlined over it in ink—'gross mineral output,' with the marginal initals, 'D. H. C.'] in all one thousand dollars [the next word cannot be deciphered] accruing from the Leatram association claim on Livengood Creek as recompense for the Abanbanment of one fraction sold to Dan McCarty on option and now in controversy between Bell & McCarty the same to be delivered to said Bell on and after the first day of May, 1916, the same to be delivered to said Bell without any contention and on demand at the clean-up, said royalties to the amount of one thousand dollars payment in full of consideration. David H. Cascaden.
"Pat O'Connor."

The words "said royalties to the amount of one thousand dollars payment in full consideration" are partially above the signature of Cascaden, apparently crowded in and partly to one side at the left of the signature of Cascaden. They are written either by a different pencil or by the same pencil in a different condition. O'Connor swears they were not there when he signed the instrument. At the time of signing the instrument Sherry was away, and O'Connor seemed to question his (O'Connor's) authority to sign. The purpose of the above instrument I think is clearly demonstrated by the following instrument, introduced in evidence as Plaintiff's Exhibit E:

"$1,000.00. Fairbanks, Alaska, May 26th, 1915.

"As per that certain agreement which was acknowledged on the 17th day of May, 1915, before Chester F. Johnson, a United States commissioner and notary public, residing at Olnes, Alaska, after date, for value received, I promise to pay to the order of Albert Bell the sum of one thousand dollars ($1,000.00) in gold dust as stipulated in said agreement, namely, twelve and one-half per cent. (12½%) of the gross mineral output of that certain placer mining claim, known as the Leatram Association, situate on the right

limit benches opposite Nos. 4 and 5 Above Creek claim, Livengood creek, a tributary of the Tolovana river, until said one thousand dollars ($1,000.00) has been paid in full.

"In the event suit is brought to collect this note, or any portion thereof, I promise to pay, in addition to the costs and disbursements provided by statute, a reasonable amount for attorney's fees.

"D. H. Cascaden.

"J. J. Sherry,

"By Le Roy Tozier, His Atty. in Fact."

The plaintiff further testified that at Brooks, Alaska, he spoke to the defendant about the balance due him, and asked him when the defendant and he were going to settle up, to which the defendant replied, "One of these days we will be settled up." Upon cross-examination of plaintiff, the following interrogatories and answers were propounded and given:

"Q. What was the date, as near as you can tell us, when you and Cascaden first talked about this agreement that you contend that Cascaden made with you to pay you $5,000 if you would throw off $5,000 of the purchase price of the McCarty contract? That was some time in May of 1915? A. Yes, sir.

"Q. Is that as near as you can come to the date? A. Yes, sir. It is when I was prospecting on Discovery.

"Q. And it was the first time Cascaden had talked to you? A. Yes, sir.

"Q. He was then at your cabin? A. No; the tent. (Further testified that Cascaden, at the time of the conversation, had been drinking a little bit, and that he [Bell] had not had a drink.)

"Q. What did you say to Cascaden, when he said, 'I want you to be good to me'? A. I asked him what it was; what it was about. Well, he said, 'I want you to do something good.' I says, 'What is it?' He says, 'Dan has jumped the Leitrim, and the only way for us to protect the Leitrim, to save it, is for you to give up the fraction and take $5,000 off your option price.' It kind of staggered me a little bit. I says, 'Is that the only way to do it?' He says, 'Yes.' And eventually I agreed to do it. * * *

"Q. You say it kind of staggered you at first—the proposition? A. Yes, sir.

"Q. After you got over the shock, what did you say? A. What did I say to Cascaden?

"Q. To Cascaden. A. I told him to look out for the rest of it for me. He said he would. He said he would make it good as soon as Dan McCarty paid him this money he owed him.

"Q. That was this $11,000 that you speak of? A. Yes, sir.

"Q. Did he say when it was that he would pay you the $5,000? A. When Dan McCarty paid him.

"Q. Did he say when Dan McCarty was going to pay him? A. No; but it was to come out of the claims, I guess.

"Q. This was in May, 1915, that you had this conversation? A. Yes, sir.

"Q. That he would pay you $5,000 when he collected it from McCarty, when McCarty paid him the $11,000? A. The $11,000; yes, sir."

The defendant's testimony is generally in flat contradiction to the testimony of plaintiff and plaintiff's witnesses. He denies absolutely any agreement on his part to pay the plaintiff $5,000, and contends that the $1,000 was to be in full settlement. The preponderance of the evidence is wholly against him. In some respects there is an indefiniteness in his testimony, amounting almost to an evasion. The following questions and answers are illustrative:

"Q. Now, why did Bell, if you know, reduce the contract price for the property by $5,000? A. I think it was in consideration of receiving $1,000 more than anything else, if there was another reason.

"Q. Was there any other reason that you know of, or any other consideration that you know of, that induced Bell to throw off $5,000 of the contract price between him and McCarty, excepting the giving up of the Totem Fraction and receiving $1,000 therefor from you and Pat O'Connor? (Interruption.)

"The Court: Q. Was there any other reason? A. The fact that he couldn't deliver the Totem Fraction was the cause of the starting of the first controversy, and that may have been the main reason.

"The Court: The question was: Was there any other consideration? A. That was the cause and the result, and that was the consideration principally."

On direct examination the defendant thus explained his settlement of his account with McCarty:

"Q. Is it true that McCarty, for a long time prior, and including this time, owed you money on an old score—an old matter? A. It was. Yes.

"Q. About what sum? A. About $11,000.

"Q. And did you settle with McCarty for a lesser sum? A. I did; yes, sir.

"Q. When did you receive your money that you accepted in full from Dan McCarty? A. I don't know as I have received quite all of it yet, but practically all of it. By last fall, 1916, late in the fall, at the close of the season, I had received the major part of it.

"Q. Did you receive any part of that money that McCarty owed you, prior to the 1st of June, 1916? A. Yes; I believe I did. I received it from the royalties from the Deep Channel claim in small proportions during the entire summer."

Defendant's affirmative defense seems to be framed under the provisions of section 1876, Compiled Laws of Alaska. Defendant pleads:

"That no note or memorandum in writing was made and subscribed to by defendant expressing any consideration for the alleged agreement between plaintiff and defendant, described in plaintiff's complaint, and is therefore void under the statute in such case made and provided."

Section 1876 provides:

"Sec. 1876. In the following cases an agreement is void unless the same or some note or memorandum thereof expressing the consideration be in writing and subscribed by the party to be charged or by his lawfully authorized agent:

"(1) An agreement that by its terms is not to be performed within a year from the making thereof;

"(2) An agreement to answer for the debt, default, or miscarriage of another;

\*          \*          \*          \*          \*          \*          \*          \*

"(6) An agreement for leasing for a longer period than one year, or for the sale of real property, or of any interest therein, or to charge or incumber the same."

Subdivisions 3, 4, 5, and 7 could not apply in this case.

I find no merit in the contention that it was an agreement by its terms not to be performed within a year from the making thereof. As was said by Justice Miller of the Supreme Court of the United States in McPherson v. Cox, 96 U. S. 404, 24 L. Ed. 746:

"It is said to be within the statute of frauds, because not in writing, and not to be performed within a year. But the statute of frauds applies only to contracts which, by their terms, are not to be performed within a year, and do not apply because they may not be performed within that time. In other words, to make a parol contract void it must be apparent that it was the understanding of the parties that it was not to be performed within a year from the time it was made." Bergh v. Wyman Farm Land & Loan Co., 30 N. D. 158, 152 N. W. 281; Duniway v. Wiley, 85 Or. 86, 166 Pac. 45.

That it was not to be performed within a year from the time it was made is negatived by the fact that the defendant at once arranged for a payment of $1,000 of the amount. The evidence shows that the real defense of the defendant is that he had made a contract for the payment of $1,000 and that he has paid it, and that he got the plaintiff to reduce

the option price to McCarty in the sum of $5,000 for the consideration of an order for $1,000.

As to whether or not it comes within the second subdivision of section 1876, Compiled Laws of Alaska, it is necessary only to apply the rule laid down in Davis v. Patrick, 141 U. S. 488, 12 Sup. Ct. 59, 35 L. Ed. 826:

"Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability."

Also see Choate v. Hoogstraat, 105 Fed. 720, 46 C. C. A. 174; Peterson v. Creason, 47 Or. 69, 81 Pac. 574; Rose v. Wollenberg, 31 Or. 269, 44 Pac. 382, 39 L. R. A. 378, 65 Am. St. Rep. 826; A. Leschen & Sons Rope Co. v. Mayflower G. M. & R. Co., 173 Fed. 855, 97 C. C. A. 465, 35 L. R. A. (N. S.) 1; In re Amsdell-Kirchner Brewing Co. (D. C.) 240 Fed. 497; Kelsey v. Munson, 198 Fed. 843, 117 C. C. A. 483; Guaranty Trust Co. of N. Y. v. Koehler, 195 Fed. 679, 115 C. C. A. 475; Johnson v. Huffaker, 99 Kan. 466, 162 Pac. 1152, L. R. A. 1917D, 872; Bauer v. N. W. Blowpipe Co., 75 Or. 1, 146 Pac. 129; Miller v. Beck, 72 Or. 140, 142 Pac. 603; 20 Cyc. 167, 168.

Coming now to subdivision 6 of section 1876 above quoted. It cannot be maintained under the evidence that the defendant's agreement with the plaintiff was either for the sale of real property or for any interest therein. In effect the defendant says to the plaintiff: You have given McCarty an option to purchase certain interests in mining claims. I can adjust the difficulties existing between McCarty and me, if you will reduce the purchase price agreed upon by the sum of $5,000, and if you will do this I will pay you the sum of $5,000.

The agreement between the defendant and plaintiff is not for the sale of real property or for any interest therein. If the plaintiff is to be charged with the knowledge of the nature of the difficulties the defendant expected to adjust and settle between McCarty and himself, then this provision under the statute of frauds would serve to effectuate, rather

than to prevent, a wrong. The evidence shows that, of the $5,000 agreed to be paid, the sum of $1,000 has been paid.

In accordance with the views herein expressed, findings of fact, conclusions of law, and judgment and decree may be prepared and submitted.

⬥See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes