## WRIGHT et al. v. FARMERS' NAT. GRAIN CORPORATION.

### No. 5281.

Circuit Court of Appeals, Seventh Circuit.
Dec. 22, 1934.

Rehearing Denied Feb. 2, 1935.

426

A. F. W. Siebel and William K. Tell, both of Chicago, Ill., for appellants.

Frederic Burnham, Irving B. Goldsmith, and Miles G. Seeley, all of Chicago, Ill., for appellee.

Before EVANS and FITZHENRY, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Appellants sued in assumpsit upon the common counts and a special count to recover from appellee a debt of approximately $80,000 owing to appellants by a third party, the Rural Grain Company. The special count sought to recover upon the theory that on and after November 1, 1929, appellee by its conduct held itself out as having purchased the business and assumed the liabilities of said Rural Grain Company and thereby created an estoppel to deny liability for the debt due appellants. Appellee pleaded non assumpsit and lack of liability because of that section of the statute of frauds (Smith-Hurd Ann. St. Ill. c. 59, § 1) requiring promises to pay debts of another to be in writing.

At the conclusion of appellants' evidence, the trial court, upon motion of appellee, directed a verdict in favor of appellee and entered judgment thereon. This appeal followed.

Appellants assign error upon the refusal to admit certain evidence and the court's direction of a verdict.

The facts proved and offered to be proved, all of which, so far as they are competent, we must consider, are substantially as follows:

Appellants, rural dealers in grain and lumber, in various down state cities of Illinois had deposited with the Rural Grain Company, owned by a cooperative company of farmers' elevator companies, securities and cash to the amount of $94,000 and had thereafter purchased and sold through Rural Grain Company on grain or security exchanges commodities and stocks, with the result that on November 1, 1929, the Rural Company owed appellants approximately $80,000.

Appellee was a Delaware corporation, organized to aid in carrying out the purposes and intendments of the Act of Congress, approved June 15, 1929, known as the Agricultural Marketing Act (12 USCA § 1141 et seq.), and operated in conjunction with the Federal Farm Board. Its charter authorized it, in brief, to buy and sell grain; to promote unity of effort by farmers and their associations in marketing grain; to provide and maintain proper "facilities" for "handling and marketing" grain "in any capacity"; to establish physical means for storing and marketing grain; to lend money to farmers' associations, grain sales agencies and "grain pools"; to acquire the rights and property and to undertake the whole or any part of the assets and liabilities of any association or corporation, for the purpose of furthering the grain business contemplated; "to pay for same in cash" or otherwise; to conduct any business so acquired; to exercise all the power necessary or convenient in and about the conduct of such business; and "to do anything that is conducive to carrying out the policy of Congress" as stated in the act aforementioned.

The Rural Grain Company was an Illinois corporation dealing in commodities upon various exchanges. Its capital stock was owned by a third corporation "National Farmers' Elevator Grain Company, cooperative." The Rural Company held membership upon the Chicago Board of Trade. Appellee desired to be admitted to that Board but had been unsuccessful in attempting to gain membership. Chiefly to bring about that end, apparently, appellee contracted on November 30, 1929, to buy from the Elevator Company and pay for the capital stock of the Rural Company. The latter contracted to sell and deliver such stock and to discharge the debts of the Rural Company on or before December 31, 1929. (Later this time was extended to February 1, 1930.) By the same contract

the Rural Company contracted to sell and the Elevator Company to buy the bank balances, securities, and accounts receivable of Rural Company. The latter agreed that it would not thereafter execute any contracts without the consent of appellee, or declare dividends, make expenditures, or incur liabilities, other than as absolutely necessary in the ordinary course of business, without such written consent. By virtue of this agreement, appellee planned to realize its ambition to acquire a seat on the Board of Trade and thus to promote its charter purposes hereinbefore referred to and to carry forward the intendments of the Agricultural Marketing Act.

Each of the parties embarked upon the performance of this contract, but before there was more than initiatory attempt to perform, appellee found other means for admission to the Board of Trade, through a nominee, and by mutual consent the contract was cancelled. In June, 1930, Rural Company became a bankrupt.

The District Court refused to admit the contract, but its contents and that of the charter are mentioned, in order that it may be clear just what power appellee had and what it proposed to do. Appellants make no contention that the contract of itself created any liability upon the part of appellee for the debt due appellants. They insist, however, that what the executive officers of appellee did and said, so far as those acts and sayings came to appellants' notice and were relied upon, was of such character as to bind appellee by way of estoppel. This evidence and the corporate records the court excluded, and it is necessary to consider it with care.

By action shown by the minutes of the board of directors of appellee and by the minutes of the "Executive Committee" and "Board of Managers" of that corporation, appellee was authorized to enter into contracts with the Rural Company and the Elevator Company for the purchase of the capital stock of the Rural Company and its assets. The various minutes offered contain, among other records, the following:

"Consideration of the purchase of the Rural Grain Co. Conference relative to salaries provided the same is purchased by the Farmers National Grain Corporation."

"Special mention was made of the purchase of the Rural Grain Company whose equipment and employees were moved into the offices of the Farmers National Grain Corporation, Monday, Dec. 2, and that furthermore, the Rural Grain Company from this date was operating as a subsidiary of Farmers National Grain Co."

"Knight, Cottington, Lynch, Allen and Hill met at the offices of Attorney Goldsmith to complete details with reference to contract covering purchase of Rural Grain Co."

"Our attorney came to the office upon request in reference to the loan application and certain matters connected with the transfer of the Rural Grain Company from its previous owners to the Farmers National Grain Corporation."

"Allen came for an interview regarding the terms of the agreement to transfer the Rural Grain Co. to the Farmers National Grain Co."

"The Executive Committee should consider the advisability of using the Rural Grain Company as a subsidiary or of purchasing its assets outright."

"Consideration of the purchase of the Rural Grain Company."

"Analysis disclosed that we should have * * * $125,000 as a loan from the Federal Farm Board before the close of the month. Of this $100,000 would be used to capitalize the Rural Grain Co."

It was clearly within the charter power and promotive of the purpose of the existence of the corporation and of the Agricultural Marketing Act that appellee become a member of grain exchanges, make contracts to that end, and buy and pay for other companies and their assets by such consideration as it might provide. In other words, appellee, to justify its existence, had not only authority but also almost a mandate from Congress to buy in such way as it saw fit, companies and their assets, if necessary to promote the cooperative marketing contemplated. The minutes quoted and others to similar effect show action by the board authorizing without limitation the purchase of the Rural Company.

In addition to this, appellee's president and its other executive officers said to appellants that appellee "had taken over all of the business and purchased the stock of the Rural Grain Company"; that Mr. Wright should "continue to do business with them"; that he should let his account stand as it then was; that there was no necessity for his demanding the payment of his money; that the Farmers' National Grain Company was behind the Rural Grain; that the Rural Grain was a subsidiary of the Farmers' Na-

tional Grain; that the Farmers' National Grain, so far as appellants' account was concerned, was as good as the United States government; that the Farmers' National Grain Corporation had purchased the business of the Rural Grain Company; that the Farmers' Company "will now and hereafter conduct its business on the Chicago Board of Trade and other boards of trade in this vicinity" through the Rural Grain Company and solicited appellants' business for and on behalf of the Farmers' National Grain Company; "Yes, that is the situation, and if you will continue to do business with us we will take care of you and leave your account stand as it is;" "that the account that appellants had with them was safe and would be taken care of by the officers of the Farmers National Grain Corporation." Publications containing somewhat similar statements were presented by one of appellants to appellee's president and the latter admitted the correctness of same.

Appellants, after these statements were made to them, made no further demand for the money due them, continued to do business with the Rural Company and knew of no repudiation of the truth of such statements until the latter became bankrupt.

■■ We are of the opinion that this excluded evidence should have been admitted and the case submitted to the jury. The charter and minutes disclose authority, in promotion of appellee's business, to do everything that appellee's president, according to the proffered testimony, said had been done. They disclose such authority granted to the executive officers. Whether the corporation did in fact assume appellants' debt is wholly beside the point. The chief executive of a corporation having power to assume debts told appellants that appellee had done that very thing. The words attributed to him are fairly susceptible of no other meaning. The authorized agent having assured appellants that such was the fact, the principal cannot deny it. Appellee is as much bound as if in fact there were an express assumption. Appellants were lulled into security; they forbore action; the original debtor became bankrupt and as a result of such forbearance appellants lost their claim. Under well-recognized rules they had a right to have the question of liability submitted to a jury.

Such an estoppel is properly pleaded in an action at law. 21 C. J. 1118, § 121. It is more than a rule of evidence; it establishes rights, and is based upon grounds of public policy and good faith. It prevents injustice by denying to one the right to repudiate his acts and representations to the detriment of another relying thereon. 21 C. J. 1117, § 120.

It is said that the statute of frauds precludes admission of these oral statements. But we believe the present case within that of Davis v. Patrick, 141 U. S. 479, 12 S. Ct. 58, 59, 35 L. Ed. 826, where the court said: "But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal, immediate, and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise. As said by this court in Emerson v. Slater, 22 How. 28, 43 [16 L. Ed. 360]: 'Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability.' To this may be added the observation of Browne in his work on the Statute of Frauds, § 165: 'The statute contemplates the mere promise of one man to be responsible for another, and cannot be interposed as a cover and shield against the actual obligations of the defendant himself.' The thought is that there is a marked difference between a promise which, without any interest in the subject-matter of the promise in the promisor, is purely collateral to the obligation of a third party, and that which, though operating upon the debt of a third party, is also and mainly for the benefit of the promisor." See, also, Nelson v. Boynton, 3 Metc. (Mass.) 396, 37 Am. Dec. 148.

The judgment will be reversed and remanded, with directions to the District Court to proceed in accordance with this opinion.