# Richmond

## PARKSLEY NATIONAL BANK, ET ALS. V. JOHN W. CHANDLER'S ADM'RS.

### April 28, 1938.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Spratley, JJ.

The opinion states the case.

*G. Walter Mapp,* for the appellants.

*Dunton J. Fatherly* and *Charles M. Lankford, Jr.,* for Northampton Lumber Company, C. M. Johnson and Lottie F. Mister, appellees.

*J. Brooks Mapp,* for Chandler's Administrators, appellees.

HOLT, J., delivered the opinion of the court.

John W. Chandler, a citizen of Northampton county, died intestate on the 18th day of February, 1935. At one time he was quite wealthy. Dead, his estate is insolvent, and this suit is brought by a creditor to enforce its distribution. The widow takes dower. The heirs and distributees get nothing. Creditors alone have any interest in what is left.

His interests were large and varied. He was president of the Parksley National Bank and had been president of that institution since March 23, 1909. From it, he was a heavy borrower. Among other claims against his estate, these that bank is now asserting:

| | | |
|---|---|---|
| "(1) | Bond of J. L. Wescott | $ 1,240.00 |
| "(2) | Bond of John A. and Benjamin T. Fisher | 1,325.00 |
| "(3) | Bond of J. L. Francis | 309.00 |
| "(4) | Bond of J. J. Gladstone | 427.18 |
| "(5) | Bond of William K. Robinson | 851.93 |
| "(6) | Bond of George Tankard | 1,326.20 |
| "(7) | Bond of Moses Harman | 362.05 |
| "(8) | Bond of George U. Stevens | 242.62 |
| "(9) | Bond of R. A. and Mary E. Turlington | 4,000.00 |
| "(10) | Bonds and judgments against V. J. Stewart and Catherine Stewart, V. A. Stewart and V. A. Stewart & Co., Inc., V. A. Stewart, president, known and usually referred to in the record as the Stewart indebtedness | 17,700.00 |
| | | $27,783.98" |

These bonds, held by this bank, are not endorsed by Chandler. It holds no written guarantee of payment from

him. For these reasons, it is contended that his estate is not liable; that under the Statute of Frauds (4th subdivision, Code, sec. 5561), written evidence to bind one for the debt of another is necessary.

In *Lyons* v. *Miller*, 6 Gratt. (47 Va.) 427, 52 Am. Dec. 129, it was held that one who for value transfers a negotiable note without endorsement guarantees the genuineness of the instrument but not the solvency of the maker. The court said:

"By declining to indorse, the defendant avoided the responsibilty of an indorser; but he could not, without an agreement or understanding to that effect, avoid the responsibility of warranting the genuineness of the instrument. That is a guaranty which the law imposes upon the transfer, for a valuable consideration, of bills, bank or promissory notes, and other assurances for money, though without indorsement. The person so transferring impliedly undertakes that the instrument is genuine, in other words, that it is what it purports to be; and if it turns out to be a forgery, there is a failure of the consideration, which subjects him to the repayment of the money he has received. Nor is it material whether the person making the transfer receives the consideration for his own use, or for the use of another; * * * "

It has also been held that no promise of a guarantor, after the transaction has been completed, binds him independent of the benefits which he may have received. *Southside Brick Works* v. *Anderson,* 147 Va. 566, 137 S. E. 371, 372.

These well established principles are to be considered in connection with the facts to which they were applied. In *Lyons* v. *Miller, supra,* this statement is important. It was said that the liability of an endorser did not attach without an agreement or understanding to that effect. The parties there dealt with each other as strangers.

A satisfactory statement of the law and its exceptions appears in 8 Am. Jur., sec. 569, which reads:

■■■ "Liability on Oral Guaranty.—Although the mere transfer of an instrument without indorsement may not make the transferrer liable for the payment of the instrument, such transferrer may be liable upon a collateral contract to pay. Where the holder of a promissory note sells it for a valuable consideration and at that time warrants or guarantees orally that the note is good and will be paid at maturity, the promisor is liable thereon in case the note is not paid. The guaranty of a note is not a promise to answer to the debt of the maker nor within the statute of frauds when it is negotiated in consideration of value received by the guarantor, but it becomes the original and absolute obligation of the guarantor himself whereby he promises to pay his own debt to the guarantee—that is to say, it is the debt he owes his guarantee for what he has received from the latter. The note, meanwhile, is delivered and held as collateral to the promise of the guarantor. If the maker pays it at the date of its maturity, the guarantor's obligation is, by that fact, discharged; but if the maker fails to pay, the guarantor remains liable upon his own obligation, which is absolute and independent of the note itself. Furthermore, the guarantor's liability is not affected by the provisions of the Uniform Act declaring that no person shall be liable upon a negotiable instrument whose signature does not appear thereon, such provision not being applicable where the liability is not predicated upon the instrument itself."

In *Davis* v. *Patrick*, 141 U. S. 479, 12 S. Ct. 58, 35 L. Ed. 826, it was held that the creditor of a mine, answering for its debt to secure prompt transportation of ore, is so interested that its promise is supported by a consideration. In a headnote to the official publication of that case, it is said:

■■ "In determining whether an alleged promise is or is not a promise to answer for the debt of another, the following rules may be applied: (1) if the promisor is a stranger to the transaction, without interest in it, the obligations of the statute are to be strictly upheld: (2) but

if he has a personal, immediate and pecuniary interest in a transaction in which a third party is the original obligor, the courts will give effect to the promise."

And in *Emerson* v. *Slater*, 22 How. (63 U. S.) 28, 43, 16 L. Ed. 360, the court said:

"Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability."

"The statute contemplates the mere promise of one man to be responsible for another, and cannot be interposed as a cover and shield against the actual obligations of the defendant himself." Browne on Statute of Frauds, sec. 165.

In *Southside Brick Works* v. *Anderson, supra,* Prentis, P., said:

██ "(4) It is perfectly well settled that no particular form of words is necessary to show an original promise or conclusion as to the intention of the parties, and that the circumstances of each case must be taken into consideration in order to determine the legal effect of such an oral promise to pay the debt of another."

We do not mean to say that Mr. Chandler intended to perpetrate a fraud. His character precludes it. But we do think it plain that this bank never intended to discount at their face value a miscellaneous collection of notes when it had had no dealings with their makers and, in some instances, had probably never heard of them.

While these notes were not endorsed by Chandler, they were presented by him for discount, were discounted at their face value, and their proceeds went to his credit; and he paid instalments of interest thereon from time to time as they accrued.

It is inconceivable that they would have been accepted at their face value if presented by a stranger. The transac-

tions themselves were inconceivable, unless we assume that there was an understanding that the bank would be held harmless. But we are not left to guess. Mr. Ross, one of the Bank directors, said:

"Q. Now in these obligations in question, being those put in the bank by Mr. Chandler and not endorsed by him, when they were reached and passed his statement would be that they are mine?

"A. Yes, sir."

And this statement he repeated to Mr. Amherine, a Federal bank examiner.

Mr. White, the cashier, testifying, it is true, as to other notes, but testifying as to Chandler's general course of business, said:

"Q. I think it is a fact, if I make a blanket statement, if on all of this paper the money wasn't given to Mr. Chandler or credited to his account.

"A. Yes, sir, on all of it. We didn't know the makers in any of these transactions. It was entirely a transaction of Mr. Chandler. Most of them we didn't even know. They have done no business with the bank. In addition I am well enough acquainted with Mr. Chandler's business by his own ledger he states that these notes are in the Parksley National Bank marked P. N. B."

Mr. Rue, another director, testified that Chandler said that these notes were his obligations, even though in somebody else's name. The reason for what was done is this: Mr. Chandler had exceeded his limits as a borrower with his bank and wished to keep out of controversy with national bank examiners. This is not a suit against a director of a national bank to enforce any liability which might rest upon him by reason of any Federal statute. Nor was his failure to endorse due to any desire to escape liability. The device adopted was adopted in good faith. He intended to meet the obligations that he had assumed and believed that he was amply able to meet them. The commissioner to whom this cause was referred has well said:

"J. W. Chandler was president of the Parksley National Bank and a large stockholder in said bank. He had borrowed directly and indirectly from this bank more than his limit as provided by the national banking laws. He procured notes and bonds from his debtors payable to the said bank as a cover for transactions which actually were between said Chandler and said bank."

The $4,000 bond of R. A. and Mary E. Turlington in no wise differs from those just considered except in this: Originally it was for $5,000. On it Mr. Turlington paid $1,000 and interest to November 17, 1933. There is no notation on Mr. Chandler's private ledger as to it. It has been reduced to judgment.

Next come the bonds and judgments against V. J. Stewart and Catherine Stewart, V. A. Stewart and V. A. Stewart & Co., Inc., V. A. Stewart, president, known and usually referred to in the record as the Stewart indebtedness, of $17,700.

Mr. White tells us of its origin:

"The beginning of the indebtedness of V. A. Stewart with the Parksley National Bank was the outcome of a joint account deal with J. W. Chandler and V. A. Stewart and H. M. Lewis of Cape Charles. They purchased a block of potatoes, I should say either 50 or 100 cars, I don't remember which, and resulted in a loss of between fifteen and sixteen thousand dollars. V. A. Stewart didn't have the money at the time. We taken his note for his loss, the Parksley National Bank, and gave J. W. Chandler credit for it."

In this failing venture, Chandler and Stewart had lost heavily, and it was necessary to secure from somewhere funds to meet their present pressing obligations. Seventeen thousand dollars may have been Stewart's share of the loss, or it may have been the entire loss suffered by these gentlemen in that transaction. Conceding that Stewart then owned valuable real estate, he was out of cash and at the end of a disastrous undertaking, which the bank, through its president and director, knew. Can any one

for a moment believe that this bank, without assurances from some source deemed reliable, would have cashed his unsupported note for $17,000?

In June, 1934, a Federal bank examiner went over the affairs of this bank and was dissatisfied with the situation. Mr. Chandler then said "that the bank had a guarantee for every loan he had ever received extending credit from his own office and he never expected to see the Parksley National Bank lose a dollar no way, shape or form." He then offered to take this Stewart indebtedness out of the bank, but it was permitted to remain, when Chandler said, "I will take care of the Stewart proposition." And he did place with the bank, as collateral, ten shares of its stock which V. A. Stewart had assigned to him.

It is a long story, and it is true that there have been efforts to collect this indebtedness from the Stewarts. That was to have been expected, for any collections made from that source not only aided the bank but reduced the liability of its president. But we come back to this: All of the obligations which we have considered were cashed by Chandler and went to his credit without any security whatever, and we cannot assume, as we do assume, that he was an upright man except upon the theory that there was always an express or implied promise on his part that he would save his bank harmless.

The conclusions which we reach are that these transactions were primarily for his benefit and have been dealt with as such from their inception.

The bank has also presented a claim for $10,000, based upon this state of facts:

The Parksley Realty Company was organized in 1930 to take over certain real estate owned by the bank. The capital stock was $25,000. Chandler bought 100 shares but did not have the cash with which to pay. The Realty Company desired to have its stock carried as full paid-up, whereupon it borrowed from the bank $10,000 for this purpose, and as collateral to secure that loan, Chandler's stock was deposited with the bank.

By way of precaution, the Realty Company has also set up against Chandler's estate this same indebtedness.

Chandler did purchase 100 shares of stock in the Realty Company. At one place Mr. White gives this account of that transaction:

"Q. Mr. White, we want to prove, in addition to proving it in the Parksley National Bank, just as a precaution, the $8,000 note. We want to prove that by the Parksley Realty Company. Of course we are not claiming it is both, but Mr. Ross and the others have told, as well as Mr. White, that transaction and we want to set that up by the Parksley Realty Company for that stock. How much of that note is now owing to the bank, this Parksley Realty Company $10,-000 indebtedness?

"A. $8,000 to the bank. What you are talking about now is the $10,000 stock that the Parksley Realty Company issued to Mr. Chandler which was never paid for. The Parksley National Bank is carrying for the Parksley Realty Company at the present time $8,000.

"Q. By whom is the other $2,000 carried?

"A. It is $3,000 due Tully F. Justis by the Parksley Realty Company, $2,000 of which is owing by Mr. J. W. Chandler to make the $10,000, and $1,000 representing $1,-000 stock issued for G. Walter Mapp."

This stock was issued as of April 19, 1930, and on the same day Mr. Chandler executed to the Realty Company his bond for $8,000; and to make confusion worse, Mr. White said that this bond represented a debt due to him because of some old lumber transactions. White's evidence as to this is uncorroborated.

The $10,000 note of the Parksley Realty Company was disallowed, as was the $8,000 claim of White. The $8,000 claim of the Realty Company against Chandler was sustained.

Claim was also made for two of Chandler's collateral notes, one for $9,500 and one for $2,500, once deposited by him with the bank as security for his indebtedness. Of this,

$5,000 was paid in cash, and a new note of $7,000 has been allowed as a claim against his estate.

S. C. White had a claim of $3,000 against Chandler. To secure this, he held as collateral bonds of L. C. Mears for $14,000, 100 shares of the Eastern Shore of Virginia Fire Insurance Company, and twenty-five shares of the Parksley National Bank. He testified that after the payment of his $3,000 debt, this collateral was to be held as security for Chandler's indebtedness to the bank. The trial court held that White's testimony as to the interest of the bank in this collateral was not corroborated, and so decreed. There was no error in this.

Our conclusion is that the ten items aggregating $27,783.98 have been established as debts against decedent's estate. Others have not been proven, or if proven, are barred by the Statute of Frauds.

The court has had to deal with claims against this decedent running into hundreds of thousands of dollars and has done, we think, the best that could have been done with them, taking the record as it stands.

Two gentlemen who filed the bill in this cause, in which they sought to collect a $2,000 debt, have been appointed commissioners to sell the real estate. The appointment of commissioners is a matter largely within the discretion of the trial court, and we know of no rule of law which governs their selection. We do think that major interests, without undue multiplication, should be represented. In the instant case, we are of opinion that one commissioner should represent the plaintiffs in this cause, one represent the Parksley National Bank, the Parksley Realty Company and Mr. White, and one represent decedent's estate. There are other assignments, but they are without merit, and we find no other reversible error in the record except those noted.

The decree appealed from should be reversed in part and affirmed in part, and it is so ordered.

*Reversed in part.*
*Affirmed in part.*

HUDGINS and GREGORY, JJ., dissenting.

The record discloses that the conceded indebtedness of the J. W. Chandler estate to the Parksley National Bank may be divided into three classes:

(1) Notes and bonds signed by J. W. Chandler as maker.

(2) Notes and bonds signed by other parties as maker and endorsed by J. W. Chandler.

(3) Notes and bonds of other parties, upon which the name of J. W. Chandler does not appear either as maker or endorser, but which, in a letter to the bank, he promised to pay in the event that they were not paid by the makers or the endorsers.

The obligations falling in the three classes totaled $81,-979.45 and were allowed as claims against the Chandler estate.

The majority opinion holds that the Chandler estate is liable for another class of obligation totaling some $27,-783.98. Chandler did not sign any of these obligations, nor did he promise in writing to pay any one of them. It affirmatively appears in the record that the bonds in question were each and all made by the parties whose names appear thereon, that they were delivered to and accepted by the bank, and carried as assets of the bank not against Chandler but against the makers.

No satisfactory reason is given why the bank required Chandler to endorse certain notes, and execute written guarantees of the payment of certain other obligations upon which his name does not appear, and did not require any written evidence of his alleged promises to pay the obligations in question. This is clearly an attempt to charge the Chandler estate upon promises to answer for the debts of others without producing written evidence of such promises.

So much of the majority opinion which holds that the statute of frauds is not a bar to the enforcement of these claims against the Chandler estate, we think is erroneous, and to that extent we do not concur with the majority opinion.